UNITED STATES of America, Appellee,

v.

Mario E. INDORATO, Defendant-Appellant.

No. 79–1460.

United States Court of Appeals, First Circuit.

Argued May 5, 1980.

Decided Aug. 21, 1980.

Willie J. Davis, for defendant-appellant.

Paul E. Troy, Asst. U. S. Atty., Boston, Mass., Edward F. Harrington, U. S. Atty., Boston, Mass., on brief, for appellee.

Before COFFIN, Chief Judge, and CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Defendant-appellant, Mario E. Indorato, appeals a jury conviction of conspiracy to commit an offense against the United States, theft of property from an interstate shipment, and perjury, in violation of 18 U.S.C. § 371, § 659, and § 2.

We review the facts and all the reasonable inferences to be drawn from them in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Doran*, 483 F.2d 369, 372 (1st Cir. 1973), *cert. denied*, 416 U.S. 906, 94 S.Ct. 1612, 40 L.Ed.2d 111 (1974). Defendant was a lieutenant on the Massachusetts State Police force with over twenty-three years of experience. Starting in February of 1977, he was assigned to the Weston barracks on the Massachusetts Turnpike as a shift commander. As such, he was responsible for the entire turnpike. His normal duty hours were from 3:00 P.M. to 11:00 P.M. The turnpike is divided into seven Sectors for patrol purposes. Sector 1 starts at the New York state line and Sector 7 extends through the tunnel to East Boston. Sector 6 runs from Interchange 12 to Interchange 15, which is in the Town of Weston.

A tandem trailer parking lot is located in Sector 6 at Interchange 14 in Weston. Massachusetts law prohibits the hauling of tandem trailers (trailers hauled behind each other by the same tractor) once a driver leaves the turnpike. The tandem lot is used by drivers to drop off the extra trailer before proceeding to off-turnpike destinations. A full trailer is sealed at the rear so that it is impossible to open the doors without breaking the seal. A person would be unable to tell from looking at a trailer head-on or from the side whether it was full or empty. If the seal has been broken or removed from the trailer doors, that is a good indication that it is empty. Full and empty trailers are parked indiscriminately in the lot so that the location of a trailer is no indication of whether it is full or empty.

The critical events leading to defendant's indictment happened on the evening of December 12, 1978. About a week prior, Corporal Carlson spoke to defendant about homosexuals harassing patrons in the men's room of the Howard Johnson Restaurant on the turnpike in Framingham. He suggested reinstituting the "fag detail," which was comprised of state troopers in civilian clothes. On December 12, defendant told Carlson and another trooper, Whittier, to be in the barracks at 5:30 P.M. to prepare for the detail. This was earlier than the detail had ever started before. Whittier was normally assigned to Troop E which covers the entire turnpike and the tunnels to East Boston. With Whittier on the special detail, there was no patrol supervisor on the road and no one took his place in Sector 7. If a tractor were parked in an unusual place, such as on an access ramp to a tandem lot, Whittier, when on patrol, would notice it and investigate.

Shortly before 3:00 P.M. on the afternoon of December 12, defendant assigned Trooper McHugh to patrol that portion of Sector 7 from the Brighton interchange through the tunnels to East Boston. He was told to pay particular attention to the toll booths at the tunnels because of recent robberies. McHugh was not to patrol the western part of Sector 7 from Brighton to Weston. Usually, each of the two troopers assigned to Sector 7 patrols its entire length from the tunnels to Weston.

At about 5:40 P.M. on December 12, defendant left the barracks at Weston and went to the tandem trailer lot at Interchange 14. He was dressed in full uniform. Usually, when defendant left the barracks, he did not wear his uniform. Defendant used a marked police cruiser called, for obvious reasons, a "blue-bird." This was contrary to his custom of driving an unmarked vehicle. Defendant gave as a reason for using the blue-bird that his vehicle bucked and kicked until it was warmed up. The mechanic responsible for servicing defendant's unmarked cruiser testified that defendant never complained that it warmed up slowly.

When defendant arrived at the tandem lot, he picked up his cousin, Billy Balliro. Robert Pyne, a city driver for Pacific Intermountain Express (PIE), arrived at the lot around 6:00 P.M. to pick up a trailer. As he came into the lot, he noticed a marked police cruiser parked ten to fifteen feet behind the trailer he had been dispatched to pick up. The headlights of the cruiser were off. A man wearing civilian clothes, a dark stocking hat, and a windbreaker was at the rear of the trailer. As Pyne started to back his tractor toward the trailer, defendant got out of the cruiser, signalled Pyne to stop, and said, "We found your trailer open." The door of the trailer was open about eighteen inches; there was freight inside. Pyne tried to open the door the rest of the way, but could not move it. He then telephoned his boss and explained what he had found. Pyne noticed two other PIE trailers in the lot. On one of them, a heavy metal security wire around the door latch looked as if it had been almost twisted off. The trailer's seal said "Port of Tocoma," which indicated that it was carrying stereo equipment. As Pyne was checking the two trailers, the cruiser pulled up and defendant asked Pyne if he knew what was in them. Although Pyne knew that one contained stereo equipment, he told defendant that he did not know. The cruiser then made a U-turn, went up the access ramp and stopped next to a tractor with its lights out but its engine running. Pyne testified that he had never seen a tractor parked on that ramp before. Four state troopers, Campbell, Mardone, MacLean, and Whittier and another PIE driver, Grenier, also testified that they had never seen a tractor parked on the access ramp. Pyne left the lot with the trailer he was dispatched to pick up and stopped at a phone booth and called the terminal. Another driver, Alfred Grenier, was sent to pick up the trailer with the stereo equipment. He arrived at the lot about 7:30 P.M., but the trailer was gone. A trailer belonging to another company was stolen from the same lot between 5:20 and 8:00 that evening. It was found empty in Cambridge at 8:45 P.M.

Trooper Kevin Regan was on the 3:00 to 11:00 P.M. shift at the Framingham barracks that day. He purchased a sandwich at about 6:30 P.M. and headed towards the tandem lot to eat it. As he drove towards the lot, he saw a blue-bird at the entrance. Defendant waved him to a stop. After some general conversation, defendant asked him what he was doing there. Regan told him that he intended to eat his sandwich there. Defendant suggested that he go to the barracks in Weston to eat it. Although Regan said he would rather eat in the lot, defendant insisted that he eat the sandwich at the Weston barracks, which he did. This was the first time that he had eaten alone in the Weston barracks.

The events subsequent to December 12, 1978, bear mainly on defendant's claim that his fifth amendment rights were violated.

### The Fifth Amendment Claim

It is defendant's contention that statements made by him in response to questions by his superiors were coerced and, therefore, proscribed by the fifth amendment from being used at his trial.

We focus now on the investigation of defendant that followed the events of December 12. Special Agent Edward Clark of the F.B.I. interviewed defendant the afternoon of December 13, after first talking to Pyne, Grenier and PIE Terminal Manager Martin. When asked by Clark who was with him when he was talking to Pyne, defendant replied that it was an off-the-road trooper and identified him as Trooper Regan. Defendant said he did not remember any tractor parked on the access ramp. On December 22, there was a meeting at State Police Headquarters in Boston at which defendant's possible role in the theft of the trailers was discussed. Those in attendance were Deputy Superintendent Trubuco, Lieutenant Colonel O'Donovan, head of the Detective Bureau, and Captain Cronin, defendant's immediate supervisor. They knew that an interview between defendant and Lieutenant White, a state police detective, and two F.B.I. agents was scheduled for later that afternoon. It was suggested that, if defendant did not cooper-

ate fully with White, he be required to give Captain Cronin a memorandum setting forth in detail his activities on December 12.

Defendant met with White and the F.B.I. agents that afternoon at the Howard Johnson Restaurant on the turnpike in Natick. He was not advised of his rights prior to questioning. It is clear, however, that he was not in custody. Among other things, defendant stated that he picked up an informant about 5:00 o'clock at the tandem lot. He refused, despite repeated questions, to give the informant's name on the ground that to do so might mean that person's death. After it became evident that defendant would not name the informant, White advised him that he was going to call Colonel O'Donovan and left the table to do so. When White returned to the table after talking to O'Donovan, defendant said, "If push comes to shove relative to my informant, I will make the decision at that time." Whereupon White said, "The time has come, push has now come to shove. I want the name, address, and telephone number of your informant this minute." Defendant then identified the informant as Billy Balliro.

After the meeting, defendant returned to the Weston barracks. Captain Cronin had him come into his office and asked about the meeting at the restaurant and then started an inquiry of his own. When Cronin started to give the *Miranda* warnings, defendant stated that he knew them. There is no need to detail further the statements made by defendant at the afternoon meeting and subsequently to Captain Cronin except to note that some of them were contradicted by government witnesses at the trial and others put in doubt by circumstantial evidence.

Defendant rests his fifth amendment coerced statements claim on *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). *Garrity* concerned an investigation of alleged fixing of traffic tickets by police officers. Prior to questioning, each officer was warned:

(1) that anything he said might be used against him in any state criminal pro-

ceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office.

*Id.* at 494, 87 S.Ct. at 617. This was in accord with N.J.Rev.Stat. § 2A:81–17.1 (Supp.1965). The Court stated the issue as follows: "Our question is whether a State, contrary to the requirement of the Fourteenth Amendment, can use the threat of discharge to secure incriminatory evidence against an employee." 385 U.S. at 499, 87 S.Ct. at 620. It held: "We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Id.* at 500, 87 S.Ct. at 620.

■ In the instant case, there was no overt threat that defendant would be dismissed if he refused to answer the questions asked. Defendant, however, takes the position that such threat was implied because the state police departmental rules, with which he was thoroughly familiar, provided for the dismissal of any officer who refused to obey the lawful order of superiors. This meant, he argues, that he had to answer the questions asked by Lieutenant White and Captain Cronin or face dismissal. Thus, defendant claims, he was in the same position as the officers questioned in *Garrity*. An examination of the rules, however, shows that defendant's position is based on a very shaky premise. Rule 10.7 provides that "[m]embers of the Uniformed Branch shall promptly obey any lawful order emanating from any superior officer." Rule 10.1 states that any member who violates any provision of the rules "may be tried by a Trial Board," and Rule 10.2 in turn provides that any member found guilty of such a violation following trial "may be subject to dismissal or such disciplinary action as the Commissioner or Executive Officer may direct." Finally, Rule 8.2 permits an appeal from any order of dismissal to the district court.

There is nothing in the record to suggest that the rules have been interpreted to mean that a state police officer who refuses on fifth amendment grounds to comply with an order to provide self-incriminating statements would be dismissed. The language used in the rules—providing that for violation a member *may* be tried and upon conviction *may* be subject to dismissal or other disciplinary action—suggests that dismissal would not have automatically followed defendant's invocation of the fifth amendment.

Neither *Garrity* nor any of its progeny brings defendant within the ambit of the coerced testimony doctrine. *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), came hard on the heels of *Garrity*. In *Gardner*, a policeman was subpoenaed to appear before a grand jury investigating bribery and corruption of police officers. After being advised that the grand jury was going to question him about the performance of his official duties and advised of his privilege against self-incrimination, he was asked to sign a waiver of immunity and told that he would be fired if he did not do so. After his refusal to sign, he was given an administrative hearing and then discharged pursuant to a specific section of the New York City Charter. In finding the Charter provisions unconstitutional, the Court was careful to note, "He was discharged from office, not for failure to answer relevant questions about his official duties, but for refusal to waive a constitutional right." *Id.* at 278, 88 S.Ct. at 1916. This is not the situation before us.

In all of the cases flowing from *Garrity*, there are two common features: (1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment (or a similarly severe sanction imposed in the case of private citizens); and (2) there is a statute or municipal ordinance mandating such procedure.[1] In this case, there was no explicit "or else" choice and no statutorily mandated firing is involved. We do not think that the subjective fears of defendant as to what might happen if he refused to answer his superior officers are sufficient to bring him within *Garrity's* cloak of protection. A somewhat similar argument was rejected by the Supreme Court in *Garner v. United States*, 424 U.S. 648, 661–65, 96 S.Ct. 1178, 1186–87, 47 L.Ed.2d 370 (1976). That case involved a nontax criminal prosecution in which the government introduced defendant's income tax returns to prove the offense against him. Defendant noted that a taxpayer who claims the privilege against self-incrimination on his tax return faces the possibility of a criminal prosecution under section 7203 of the Internal Revenue Code for failure to make a return. He then argued that the possibility of prosecution, like the threat of discharge in *Garrity*, compelled a taxpayer to incriminate himself on the tax return rather than invoke the privilege. The Court pointed out that what defendant really sought was a preliminary ruling procedure for testing the validity of

1. *Sanitation Men v. Sanitation Comm'r*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); dismissal for refusal to sign waivers of immunity before testifying before the grand jury pursuant to section 1123 of the New York City Charter. In *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), New York ordinance and statute required public contracts to provide that, if a contractor refused to waive immunity or answer questions when called to testify about his contracts with the state or any of its subdivisions, his existing contracts could be cancelled and he would be disqualified for five years from further doing business with the state. Defendants, two architects, were summoned to testify before a grand jury investigating bribery and larceny. After refusing to sign waivers of immunity, the district attorney noti-

fied the official contracting authorities of the disqualification statutes. In *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977), the New York election laws provided that an officer of a political party could be subpoenaed by a grand jury and required to testify concerning his conduct of the party office he occupied. If he refused to answer any questions or did not waive immunity, the statute terminated his public office and prohibited him from holding any other party or public office for a period of five years. Defendant was summoned to appear before a grand jury; he refused to sign a waiver of immunity and refused to answer, thus triggering the self-executing statute. He was divested of his party offices and banned for five years from holding any public or party office.

the asserted privilege. In rejecting this claim, it quoted *United States v. Murdock*, 284 U.S. 141, 148, 52 S.Ct. 63, 64, 76 L.Ed. 210 (1931):

> While undoubtedly the right of a witness to refuse to answer lest he incriminate himself may be tested in proceedings to compel answer, there is no support for the contention that there must be such a determination of that question before prosecution for the willful failure so denounced.

424 U.S. at 664–65, 96 S.Ct. at 1187.

Here, defendant did not claim the privilege. He was not told that he would be dismissed if he failed to answer the questions asked. He was not asked to sign a waiver of immunity. There was no statute mandating dismissal for refusal to answer hanging over his head. Defendant, here, was not, as in *Garrity*, put "between the rock and the whirlpool," 385 U.S. at 498, 87 S.Ct. at 619; he was standing safely on the bank of the stream.

*The Grand Jury Testimony*

■ The claim of coerced grand jury testimony is rejected for the same reasons. We must note that during the two-month interval between the state police inquiries and his grand jury appearance, defendant had consulted with counsel. Before testifying, defendant was informed that he was a target and fully advised of his *Miranda* rights. He was not ordered by his superiors to testify before the grand jury and there was no threat of discharge if he failed to do so. Defendant does not have even a colorable claim that his grand jury testimony was coerced.

■ Defendant further claims that his misrepresentations were not material and, therefore, could not be the basis of a perjury indictment. We agree with the district court that this contention is groundless. The grand jury was investigating the possible involvement of defendant in the theft of two truck trailers. It also was trying to determine if others were involved and, if so, their identity. The alleged misstatements consisted of defendant's explanation for the presence of Balliro in the tandem lot. Defendant testified that Balliro was there to seek advice for his girl friend's daughter who was thought to be connected with a murder that had been committed in Waltham.

In order to sustain a conviction under 18 U.S.C. § 1623, the false testimony must be material to a proper inquiry of the grand jury. *United States v. Williams*, 552 F.2d 226, 230 (8th Cir. 1977). We think it obviously material for the grand jury to attempt to find out why a civilian would clandestinely meet a fully uniformed state trooper in a parking lot on the same night that two trailers were stolen from it. In the light of Pyne's testimony, the reason for Balliro's presence was not only material, it was critical. As the district court pointed out, any concealment of the actual reason would have tended to impede or hamper the course of the investigation. *United States v. Phillips*, 540 F.2d 319, 328 (8th Cir.), cert. denied, 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976). The grand jury was investigating the theft of two trailers. The reason for anyone's presence in the tandem lot on the night of December 12 was material, so that, at a minimum, further investigation could have resulted. *United States v. Rapoport*, 545 F.2d 802, 805 (2d Cir.), cert. denied, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1976). The court did not err in refusing to dismiss the perjury count.

*Count I*

■ Defendant assigns as error the denial of his motion to dismiss Count I of the indictment. Count I alleged that defendant "did knowingly and intentionally conspire . . . with diverse persons whose names to the Grand Jury are presently unknown," to violate 18 U.S.C. § 659 (theft of an interstate shipment). Defendant claims that the failure to name a coconspirator denied him due process because it prevented him from preparing a defense and exposed him to another prosecution on the identical charge. The Supreme Court has explicitly held:

> Of course, at least two persons are required to constitute a conspiracy, but the

identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown. *Rogers v. United States*, 340 U.S. 367, 375, 71 S.Ct. 438, 443, 95 L.Ed. 344 (1951). *See also United States v. Rivera Diaz*, 538 F.2d 461, 465 (1st Cir. 1976). In *Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962), the Court set forth the protections to be guaranteed by an indictment:

> In a number of cases the Court has emphasized two of the protections which an indictment is intended, to guarantee, reflected by two of the criteria by which the sufficiency of an indictment is to be measured. These criteria are, first, whether the indictment "contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet,'" and, secondly, "'in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.' *Cochran and Sayre v. United States*, 157 U.S. 286, 290 [15 S.Ct. 628, 39 L.Ed. 704]; *Rosen v. United States*, 161 U.S. 29, 34 [16 S.Ct. 434, 40 L.Ed. 606]." *Hagner v. United States*, 285 U.S. 427, 431 [52 S.Ct. 417, 419, 76 L.Ed. 861]. *See Potter v. United States*, 155 U.S. 438, 445, [15 S.Ct. 144, 39 L.Ed. 214]; *Bartell v. United States*, 227 U.S. 427, 431 [33 S.Ct. 383, 57 L.Ed. 583]; *Berger v. United States*, 295 U.S. 78, 82 [55 S.Ct. 629, 79 L.Ed. 1314]; *United States v. Debrow*, 346 U.S. 374, 377–378 [74 S.Ct. 113, 98 L.Ed. 92].

Count I[2] meets fully these protective requirements. It contains the essential elements of a conspiracy; an agreement with an unlawful object, and at least one overt act (eight are alleged) with a careful particularization of times, locations and other pertinent circumstances.

### The Conduct of the Trial

■ Defendant asserts that the cumulative effect of allowing leading and irrelevant questions deprived him of a fair trial. He refers us to three pages in the transcript to document, his claim as to leading questions. The first question, directed to Pyne, concerned the general duties of another PIE driver, Grenier.[3] The second was not even a leading question.[4] The third transcript reference was to a bench conference at which defense counsel stated that he was not objecting to all the leading questions and asked the prosecutor to curtail such questions. The trial judge stated that, if a leading question were innocuous, he would allow it because it "tends to get things done more rapidly." Our examination of the transcript reveals no leading questions in or near a vital area.

■ We also find no due process violation because of irrelevant questions. The testimony of Lieutenant White on the time it took to drive from the trailer lot to where one of the stolen trailers was recovered was relevant. That Lieutenant White used a police cruiser and not a tractor-trailer, the speed at which he drove, and that it was done in July, not December, were matters for cross-examination and ultimately for the jury to consider. Nor are we moved by

**2.** On or about December 12, 1978, at Weston and elsewhere in the District of Massachusetts, [defendant] did knowingly and intentionally conspire, combine, confederate and agree with diverse persons whose names to the Grand Jury are presently unknown, to commit an offense against the United States, that is, to steal, with the intent to convert to their own use, goods, chattels, and other property having a value of over $100, from a storage facility, depot, wagon, motor truck, and other vehicle, which goods, chattels and property were then moving as, and which were then a part of, and constituted, interstate shipments of freight and express, in violation of Title 18, United States Code, Section 659; all in violation of Title 18, United States Code, Section 371.

**3.** "Q And do you know an Al Grenier?
A Yes, I work with him.
Q And what's his occupation?
A Same as mine; he's a driver.
Q So, basically, what would you do? You'd go and pick up a trailer and bring it back in?"

**4.** "Q What about if a trailer doesn't have a seal on it; what can you tell us about that? What might that signify to you?"

defendant's contention that it was prejudicial to allow in testimony about the murder in Waltham. Defendant himself interjected the Waltham murder into the trial. The reason he gave for meeting Balliro at the tandem lot was that Balliro wanted to get his advice about the possible involvement of his girl friend's daughter, Liza, in the murder. The government presented evidence that Balliro did not know of the murder until three days after the meeting with defendant. The government had to introduce some of the details of the killing to establish the date. Moreover, the court excluded a great deal of what the government sought to introduce on this point.

We find no error in the way the court handled the trial and, indeed, think it did an exemplary job.

### Sufficiency of the Evidence

■ We have already outlined the salient facts as to Counts I and II and have no difficulty finding that there was ample evidence for a conviction on these. Defendant's argument on the perjury count is a little less ephemeral, but still very flimsy. The government showed that neither Balliro's girl friend nor her daughter had spoken to him about the murder in Waltham. This undercut defendant's testimony that this was what he and Balliro discussed in the parking lot. But, says defendant, this did not preclude the possibility that Balliro got his information from other sources.[5] He points to testimony by the girl's grandmother that she told Balliro about the murder prior to December 12. Defendant cannot, however, isolate the parking lot conversation from the other evidence which showed that defendant and Balliro were in the parking lot together to steal at least one trailer, not to discuss the murder in Waltham. The pertinent law is well stated in *United States v. Gabriner*, 571 F.2d 48, 50 (1st Cir. 1978):

> In evaluating an appeal from a denial of a defendant's motion for a directed verdict of acquittal, we must evaluate the evidence in the light most favorable to the prosecution, with all inferences that

may legitimately be drawn. *United States v. Scibelli*, 549 F.2d 222, 229 (1st Cir. 1977); *United States v. Klein*, 522 F.2d 296, 302 (1st Cir. 1975); *United States v. Doran*, 483 F.2d 369, 372 (1st Cir. 1973). The prosecution may prove its case by circumstantial evidence, and it need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt. *United States v. Concepcion Cueto*, 515 F.2d 160, 162 (1st Cir. 1975); *United States v. Currier*, 454 F.2d 835, 838 (1st Cir. 1972); *Dirring v. United States*, 328 F.2d 512, 515 (1st Cir. 1964). *See also Parker v. United States*, 378 F.2d 641, 644–45 (1st Cir. 1967). The trier of fact is free to choose among various reasonable constructions of the evidence. *United States v. Klein*, 522 F.2d 296, 302 (1st Cir. 1975).

*See also United States v. Brown*, 603 F.2d 1022, 1024–25 (1st Cir. 1979). Notwithstanding the grandmother's testimony and the possibility that Balliro could have obtained knowledge of the murder from other sources, there was sufficient evidence for a perjury conviction.

### The Closing Argument of the Prosecutor

■ Defendant claims that the prosecutor argued facts not in evidence when he commented on portions of defendant's grand jury testimony. The grand jury minutes were admitted in evidence for the purpose of establishing the alleged false statements of defendant. Defendant's argument is that the prosecutor referred to portions of defendant's grand jury testimony that did not relate to the perjury charge. This is drawing so fine a line that it vanishes as we examine it. The prosecutor did not misrepresent the grand jury testimony. He may have strayed a little into forbidden territory, but not so far as to be prejudicial. The court gave extensive instructions on the use of the grand jury testimony. We are confident that the jury was not misled or confused by the prosecutor's argument.

---

5. Balliro himself did not testify.

*The Charge*

■ Defendant attacks the charge on two grounds: that the court failed to include an instruction on "consciousness of guilt," and that the instruction on reasonable doubt was constitutionally deficient.

Both defendant and the government offered an instruction on consciousness of guilt. The court accepted neither and gave none at all. We find that, if there was error, it was harmless beyond a reasonable doubt. After a careful reading of the entire charge, we are not persuaded that a consciousness of guilt instruction was necessary. Defendant testified at length at the trial. If the jury had believed him, he would not have been convicted. We know of no holding that such an instruction is mandated in every case in which a jury may find that a defendant has made false and misleading statements at the outset of a criminal investigation. The application of such an instruction is best left to the discretion of the trial court.[6] The charge here was thorough, accurate, and clear. The jury was instructed on the elements of the crimes, the presumption of innocence, proof beyond a reasonable doubt, the weighing of evidence, the limited use of grand jury testimony and prior inconsistent statements, the difference between circumstantial and direct evidence, and the drawing of reasonable inferences. The omission of the requested instruction was neither erroneous nor prejudicial to defendant.

■ The reasonable doubt portion of the charge, however, does give us pause. We realize that this concept is difficult to ex-

plain to a jury. *Dunn v. Perrin*, 570 F.2d 21, 22 (1st Cir.), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978). The Court, after objection by counsel, realized that the instruction it had given[7] was not entirely satisfactory and, therefore, instructed again on reasonable doubt:

I told you that each and every essential element of any particular count must be established beyond a reasonable doubt. Failure to establish beyond a reasonable doubt means that that count has not been proved sufficient for you to return a verdict of guilty. Therefore, you have to be clear in your mind what reasonable doubt means.

I essentially, and what's important is that you understand that you must be morally certain, reasonably certain, as to the defendant's guilt. If you are not morally or reasonably certain, then, of course, the fact has not been established of the defendant's guilt.

I have already told you that the moral and reasonable certainty does not mean absolute certainty. I have told you that it is not to a mathematical or scientific certainty. It's just are you reasonably certain, as reasonable, healthy mature individuals, of the evidence, such that you can determine from the evidence that the defendant is guilty beyond a reasonable doubt.

The interchangeable use of the phrases "morally certain" and "reasonably certain" is, we think, of dubious value. While we have never proscribed the equating of moral certainty with proof beyond a reasonable

---

**6.** The approved instruction is different from that submitted by either party. *See* 1 Devitt & Blackmar, Federal Jury Practice and Instructions § 15.12, at 466–67 (3d ed. 1977).

**7.** Beyond a reasonable doubt. This is the responsibility of the prosecutor, to prove to you that the defendant is no longer innocent but guilty. And that burden remains, began with, and remained with the prosecution until the evidence closed, and the evidence had established to you that he was not innocent but at least guilty.

Now beyond a reasonable doubt does not mean beyond any doubt at all. That's not what the law requires. Only to a moral certainty.

It's not to a mathematical certainty, not to a scientific certainty, or to an absolute certainty. So if you are satisfied to a reasonable certainty, that you, as reasonable moral human beings, believe that the facts have been established by the evidence, then you are under oath to bring back a verdict of guilty. If, however, you are left with uncertainty, that you are not reasonably certain, not conscientiously convinced that the elements have been established, then you will find the defendant not guilty. Because in our land, in our jurisprudence, in our system of justice, the defendant is presumed to be innocent until proven guilty.

doubt, we have indicated our uneasiness with this phraseology and pointed out that it has been the subject of mixed reviews.[8] *Dunn v. Perrin,* 570 F.2d at 24; *United States v. McDonald,* 455 F.2d 1259, 1263 (1st Cir.), *cert. denied,* 406 U.S. 962, 92 S.Ct. 2070, 32 L.Ed.2d 350 (1972). While we prefer to leave the difficult art of instructing the jury on reasonable doubt in the capable hands of the district judges, we hope that it can be done without reference to moral certainty or variations thereof.[9]

Despite our reservations, we think that the charge passes muster. While we discourage the "moral certainty" phraseology, we do not regard its use as reaching the level of legal or constitutional error. The first and last paragraphs of the revised instruction make it clear that the government must prove defendant's guilt beyond a reasonable doubt. Moreover, defendant failed to object to the use of the phrase "moral certainty," which he now urges as the main reason for the charge being incorrect. At the bench conference following the charge, defense counsel stated, "First of all I object to the court's definition of reasonable doubt." The court asked, "What aspect of that do you object to?" Defense counsel responded, "That part dealing with conscientious—I'm not quite sure how you phrased it. *Not the moral aspect . .* . (emphasis added). There was no objection at all after the second instruction. Fed.R. Crim.P. 30 states in pertinent part: "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Because defendant failed to meet this requirement, he has to show plain error, a standard clearly not met here.

*Affirmed.*

---

8. Moral certainty could be interpreted to mean that the certainty is based on feeling, *i. e.,* moral conviction, rather than facts.

9. *See* 1 Devitt & Blackmar, Federal Jury Practice and Instructions § 11.14 (3d ed. 1977).