UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT

No. 94-2092

DONNA SINGER,

Plaintiff, Appellee,

v.

STATE OF MAINE, ET AL.,

Defendant, Appellee.

JOHN LAFAVER, ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Morton A. Brody, U.S. District Judge]

Before
Torruella, Chief Judge,
Bownes, Senior Circuit Judge,
and Stahl, Circuit Judge.

Roy S. McCandless, with whom Charles A. Harvey, Jr., and Verrill
& Dana were on brief for appellee State of Maine, Bureau of Taxation,
and appellants John LaFaver, David Campbell, Stephen Murray, and
Elizabeth Dodge.
Joyce A. Oreskovich, with whom Claudia C. Sharon, and Sharon &
Oreskovich were on brief for appellee.

April 13, 1995


BOWNES, Senior Circuit Judge. Plaintiff-appellee BOWNES, Senior Circuit Judge.

and defendants-appellants were employees of the State of

Maine Bureau of Taxation ("Bureau") when this suit arose.

Defendants were senior management supervisors.1 Plaintiff

Donna Singer was a tax examiner in the Collections Unit of

the Enforcement Division. Singer was discharged from the

Bureau in November 1992, less than a year after she (along

with six other Bureau employees) filed both state and federal

age and sex discrimination claims against her employers.

In February 1994, after having received right-to-

sue letters from both the Maine Human Rights Commission

("MHRC") and the Equal Employment Opportunity Commission

("EEOC"), Singer filed suit in the district court against the

Bureau and these defendants in their official and individual

capacities. The complaint alleged that defendants violated

state and federal law by firing her in retaliation for her

having filed the discrimination claims against them. The

complaint also alleged, under 42 U.S.C. 1983, that: (i)

the process by which Singer was terminated violated her due

process rights under the Fourteenth Amendment; and (ii)

defendants violated her Fifth Amendment right against



1. Defendant John LaFaver was State Tax Assessor;
David Campbell was Director of the Administrative Services
Division of the Department of Administrative and Financial
Services; Stephen Murray was Director of the Enforcement
Division; and Elizabeth Dodge was Acting Director of the
Enforcement Division.

-2- 2

compelled self-incrimination by firing her after she refused

to answer questions asked during an investigation into her

conduct as a Bureau employee. In response to defendants'

motion for summary judgment on all counts, the district court

held first, that Singer's cause of action under 42 U.S.C.

1983 was barred against the Bureau and the individual

defendants in their official capacities. Second, the court

denied defendants' motion for summary judgment on the

retaliation claims. Third, the court held that the

individual defendants were entitled to qualified immunity as

to the Fourteenth Amendment claim, and granted their motion

for summary judgment. Singer does not appeal this ruling.

Finally, the court denied defendants' motion for summary

judgment with respect to the Fifth Amendment claim, holding

that they were not entitled to qualified immunity. The sole

issue on appeal is whether defendants are entitled to

qualified immunity on the Fifth Amendment claim. We reverse.

I. Background I. Background

On appeal from a denial of a defendant's motion for

summary judgment, the court must view the facts in the light

most favorable to the plaintiff. Cotnoir v. University of

Maine Sys., 35 F.3d 6, 8 (1st Cir. 1994) (citing Febus-

Rodr guez v. Betancourt-Lebr n, 14 F.3d 87, 89 (1st Cir.

1994)). Both cases turned on the issue of qualified

immunity.

-3- 3

In February 1992, Singer joined six other Bureau

employees in filing age and sex discrimination claims, first

with the MHRC, and later with the EEOC.2 In a letter dated

April 29, 1992, addressed to defendants Campbell and LaFaver,

the MHRC requested information relating to the discrimination

complaint ("the complaint"), and asked that certain Bureau

representatives be present at a fact-finding conference

scheduled for June 5, 1992. Over the next several months

following the filing of the complaint, the MHRC conducted an

investigation of the claims alleged therein.3 During this

period, certain incidents occurred which caused Singer to

feel that she was being "singled out" for questioning and

disciplinary action in retaliation for her involvement with

the complaint.

The first incident occurred on May 29, 1992, when

Singer was questioned by a supervisor, Frank Hiscock,4

apparently for the first time in her twenty-one year career

with the Bureau, about a pattern of tardiness. Singer

explained that unforeseeable tardiness was an unavoidable



2. Prior to February 1992, Singer had never filed a union
grievance; she had, however, filed a previous complaint with
the MHRC, when she was "passed over" for the job of tax
examiner in the early 1980's.

3. The EEOC held its own investigation in abeyance pending
the outcome of the MHRC investigation.

4. Hiscock is not a party to this litigation, but was among
those whose presence was requested at the MHRC fact-finding
conference.

-4- 4

consequence of a disability from which she had suffered for

fifteen years prior to this incident. According to the

defendants, the Bureau had no previous knowledge or record of

Singer's disability and the decision to question her about

her tardiness was in no way connected to her involvement with

the complaint.

For her part, Singer maintains that her tardiness

had never before been an issue; that, prior to the filing of

the complaint, her tardiness had been neither documented nor

questioned by any supervisor; and that, when she was tardy,

she always made up the time at the end of the day. In

response to the supervisor's request, Singer arranged with

her attorney and doctor to provide the Bureau with

documentation of her medical condition. The attorney

informed defendant LaFaver of Singer's disability soon after

the May incident, and the doctor prepared the statement in

early June. By error, however, the doctor's statement was

not sent to the Bureau at that time.

On October 16, 1992, Singer was again confronted

with the issue of tardiness by a new supervisor, Mark

Hathaway,5 a former co-worker, who stated that he was

unaware of her disability and that there was no doctor's

confirmation of her condition on file with the Bureau.



5. Like Hiscock, Hathaway is not a party to this suit, but
his attendance at the MHRC fact-finding conference was also
requested.

-5- 5

Singer's attorney subsequently enclosed the doctor's

statement with a letter to defendant Murray, dated October

21, 1992.

Singer's belief that she had been targeted for

discipline because of her involvement in the complaint was

buttressed by her discovery that, some time after the

complaint was filed, defendant Campbell, in a memorandum to

Sawin Millet, Commissioner of the State of Maine Department

of Administrative and Financial Services, had referred to

Singer as one of the "troublemakers" at the Bureau.

In late August 1992, an incident ("the TRACE

incident") occurred, which prompted the Bureau to investigate

Singer's conduct as a Bureau employee. To understand the

TRACE incident, it is necessary to know more about Singer's

job. A tax examiner in the Collections Unit monitors

delinquent taxpayer accounts and contacts these taxpayers in

an effort to collect the taxes owed. Each examiner services

many hundreds of accounts. Information relating to each

account, along with information regarding contacts made and

actions taken by the examiner, are recorded in a computerized

system known as TRACE. The examiner's first step in the

collection process is to attempt to make personal contact

with the taxpayer, by telephone or in writing. In the event

the examiner is unsuccessful in her attempts to collect the

taxes, the next step is to issue a levy demand against the

-6- 6

taxpayer, which notifies the taxpayer that the debt must be

paid within ten days, and outlines the actions to be taken if

payment is not received within that time. These actions

include, but are not limited to, involuntary wage levies,

liens, seizure of property, and public disclosure of the debt

in court. If the debt is not paid in response to the levy

demand, the state is allowed to take possession of the

taxpayer's assets in lieu of payment.

By law and Bureau policy, employees are required to

maintain the confidentiality of all taxpayer records. Bureau

policy requires that each employee sign a statement

acknowledging both the responsibility to maintain

confidentiality and that the unauthorized disclosure of tax

information could result in immediate dismissal and the

imposition of penalties under state and federal law. Singer

signed confidentiality statements in 1985 and 1987.

The TRACE incident began when a Bureau supervisor

received an anonymous telephone call from a woman who accused

a Bureau clerk of discussing her tax account outside the

Bureau. The accusation was apparently unfounded. The clerk

had recently experienced a number of problems with a woman

who had become involved with her estranged husband. She

suspected that the anonymous caller was the same woman and

that the call had been made in order to cause the clerk

trouble with the Bureau. Having identified the woman as a

-7- 7

delinquent taxpayer whose active account had been assigned to

Singer, the clerk and another employee talked to Singer about

the situation.

Singer herself had no personal relationship with

the suspected caller and did not know her. Singer gathered

from the conversation that the clerk was very upset because

she thought that she might be fired as a consequence of the

anonymous call. Singer looked up the name of the woman in

the TRACE system and noted the status of the account.

Singer's conversation with the clerk later resumed. When, in

the course of relating another incident involving the

suspected caller, the clerk mentioned the city in which the

woman lived, Singer realized that this information did not

comport with the address listed for that account in the TRACE

system, the address at which Singer tried unsuccessfully to

contact the woman a year ago, when she had last worked on the

account. Singer then asked for and received from the clerk

the correct address and telephone number for the woman.

When Singer returned to her work station, she again

called up the woman's account on the TRACE system, and

recorded the following message: "[The woman] called in to try

to get [the clerk] in trouble. The complaint was unfounded

and that of a personal nature between them." Singer argues

that it was not at all unusual to record such a message and

that she did so simply to notify other employees who might

-8- 8

have dealings with the account that the woman might cause

problems.

In the course of recording the message, Singer

noticed a "CP code" on the system that alerted her to the

fact that the taxpayer was listed on another part of the

system as owing additional taxes. According to Singer, it

was part of her job as an examiner to consolidate these

accounts and inform the taxpayer of the total amount owed.

In order to do that, it was necessary to enter into the

system a request for a levy demand. According to Singer,

under these circumstances, in which the examiner has

previously tried and failed to establish contact with the

taxpayer, and must now notify the taxpayer of the total

amount of the consolidated debt, a levy demand is the only

means of notification available to the examiner.

Accordingly, in addition to updating the address and phone

number, Singer entered the following TRACE message: "Going to

have [the accountant] send a Levy Demand on all because they

also owe for a CP under 1983."

The clerk somehow learned of the TRACE message, was

upset by it, and reported it to her supervisor, Brian Mahany.

When Singer learned that the clerk was upset about the

message, she asked to speak with Mahany about it in order to

explain to him what she had done and why. Although Singer

believed she had done nothing unusual or inappropriate,

-9- 9

Mahany made it clear that he thought otherwise. After asking

her to remove the message, which was impossible because the

messages entered are permanent, Mahany instructed Singer to

add the following message: "If this lady should call with any

complaint, give call to a supervisor." He then took action

to freeze the levy demand and reported the matter to

defendants Dodge and Murray. The Bureau's position is that

Singer's conduct in this regard was subject to investigation

and possible discipline because Singer: (i) removed the

account from its predetermined position in the TRACE system's

chronological order of priority without first attempting

personal contact with the taxpayer; (ii) entered a personal

message on the TRACE system and took official action against

a taxpayer for personal reasons; and (iii) issued the levy

demand out of the normal sequence in which such action would

have been taken in the ordinary course of Bureau business.

Singer's position is that the Bureau's response to

the TRACE incident is another indication that she had been

targeted for discipline because of her participation in the

MHRC complaint. She argues that her conduct was not

inappropriate because neither the message nor the actions she

took were personal, unusual, or extreme. Furthermore,

affidavits sworn by co-workers indicate that: (i) such

messages were frequently entered into the system, sometimes

by supervisors; (ii) at the time of the TRACE incident, there

-10- 10

were no written rules governing such messages; and (iii) at

the time of the incident, the decision when to issue a levy

demand was discretionary with the tax examiner.

On August 27, 1992, Singer was called to a meeting

with defendant Dodge and Supervisor Mahany, at which Dodge

questioned her about the TRACE incident. Dodge took the

position that Singer's actions were related to the personal

life of a Bureau employee, rather than to official Bureau

business, and therefore were inappropriate. Singer explained

that the message was neither personal nor unusual, and that

her decision to issue the levy demand had nothing to do with

the clerk's problems with the caller. Unsatisfied with

Singer's explanation for her conduct, Dodge informed Singer

that the investigation would continue. According to Singer,

Dodge also asked Singer to provide her with examples of

similar messages that had been entered into the TRACE system.

A meeting to investigate the matter further was

scheduled for October 2, 1992. On September 30, 1992,

Singer's attorney called defendant Dodge to request

permission to attend the meeting. Singer wanted her attorney

present because she felt certain that she was being singled

out for disciplinary action in retaliation for the MHRC

complaint. The request was granted, but the attorney was

unable to attend the meeting for other reasons. Present at

the meeting for the Bureau were Supervisor Hathaway,

-11- 11

Personnel Manager Pat Beaudoin, and defendants Murray and

Dodge. Singer was present, represented by Roger Parlin of

the Maine State Employees Association ("MSEA"). Parlin is

not an attorney.

At the outset of the meeting, Dodge announced that

its purpose was to discuss an incident related to Singer's

work. She then questioned Singer about the TRACE incident

and Singer answered all the questions put to her. Although

the record is not clear as to exactly what happened at the

conclusion of the questioning, it does establish the

following: (i) Parlin tried to ascertain whether it was the

Bureau's position that Singer had broken the law; (ii)

although Murray stated that the meeting was a fact-finding

session and not a criminal investigation, both Singer and

Parlin believed there to be a threat of criminal charges;

(iii) Parlin had in his possession copies of TRACE screen

printouts, which had been redacted so as to exclude

confidential taxpayer information, and which contained

messages similar to the one for which Singer was under

investigation that had been entered into the system by other

Bureau employees;6 (iv) at some point, the defendants became



6. The record also indicates that, in the course of her
questioning of Singer, Dodge herself displayed a similarly
redacted printout of the TRACE screen at issue in the
investigation, in full view of Parlin.

-12- 12

aware that Parlin had these documents in his possession; and

(v) Parlin, followed by Singer, left the meeting abruptly.

Concerned that Singer had disclosed confidential

taxpayer records to union representatives without

authorization, in violation of law and Bureau policy,

defendants Murray and LaFaver attempted to recover from

Parlin and the MSEA any confidential Bureau records in their

possession. In one such attempt, a letter to the MSEA Chief

Counsel dated October 14, 1992, LaFaver stated that he had

reviewed the matter with the State Attorney General, who

shared his view that "this situation appears to involve an

extremely serious breach of taxpayer confidentiality." The

MSEA maintained throughout that it did not have any

confidential taxpayer information.

Meanwhile, in letters to defendants Murray and

Dodge, dated October 21 and October 27, 1992, respectively,

Singer's attorney stated that she understood Singer to have

been threatened with criminal charges at the October 2

meeting, and asked to be advised of the nature and status of

those charges. In both letters, the attorney made it clear

that Singer would not be allowed to meet with anyone

concerning criminal charges without benefit of counsel. In

the letter of October 27, the attorney also said that, in

order to advise her client, she needed to know the questions

that would be asked at the next investigatory meeting. The

-13- 13

Bureau did not respond to these requests for clarification

regarding the threat of possible criminal charges perceived

by Singer and her representatives.

The Bureau scheduled another meeting for November

10, 1992, in order to ask additional questions. The Bureau

was represented at this meeting by the same people who

attended the October 2 meeting: Supervisor Hathaway,

Personnel Manager Beaudoin, and defendants Murray and Dodge.

Singer was present, represented by Robert McLaughlin, a

different MSEA representative, who is not an attorney.

Singer's attorney was present, but was not allowed to

participate. At the outset of this meeting, prior to any

questioning, McLaughlin asked to know the purpose of the

meeting, whether it was a criminal investigation, and whether

he could tape the meeting. Defendant Dodge replied that the

meeting pertained only to alleged work-related misconduct,

that it was not a criminal investigation, that no one at the

Bureau was empowered to conduct a criminal investigation, and

that the meeting could not be taped.

Before proceeding with the questioning, defendant

Dodge told Singer that it would be to her advantage to answer

the questions. Singer was neither advised of, nor was she

asked to waive, her Fifth Amendment privilege against self-

incrimination. She was not told that there would or would

not be a criminal investigation in the future; nor was she

-14- 14

informed whether the answers she gave at this meeting could

be used against her in a subsequent criminal proceeding, or

that she would be fired if she refused to answer the

questions put to her at this meeting.

The first two questions asked whether Singer had

provided Parlin with TRACE screen printouts or other Bureau

documents. When Singer did not answer these questions

pursuant to the whispered instructions of her attorney,

McLaughlin was reminded that the attorney was not allowed to

participate in the meeting. Singer's attorney thereupon

requested and received a copy of the five questions to be

asked, and met outside privately with Singer and McLaughlin.

When the investigatory meeting reconvened, McLaughlin

announced that he would not allow Singer to answer questions

one through four (which asked whether Singer had disclosed to

Parlin or to anyone else TRACE screen printouts or other

Bureau documents) because they were not job related. After

repeating her previous admonition that it would be to

Singer's advantage to answer, defendant Dodge asked the five

questions. The record indicates that McLaughlin would not

allow Singer to answer questions one through four. There is

no indication that Singer verbally invoked her Fifth

Amendment privilege at any time during the meeting. In

answer to the last question (whether Singer agreed with the

MSEA Chief Counsel that Murray had given a TRACE screen

-15- 15

printout to Parlin at the October 2 meeting) Singer replied

that defendant Dodge, rather than defendant Murray, had done

so. Before the meeting adjourned, McLaughlin stated that the

MSEA had nothing confidential in its possession.

On November 16 and 17, 1992, McLaughlin spoke by

telephone with Personnel Manager Beaudoin. McLaughlin stated

that Singer's attorney had reviewed the criminal statutes and

determined that admissions made by Singer could subsequently

be used against her. He added that Singer would answer

questions presented in writing if they were related to the

original incident, but that the questions asked at the

November 10 meeting would not be answered.

On November 19, 1992, defendant LaFaver delivered

to Singer a letter informing her that the investigators had

concluded as follows: (i) Singer had ordered the levy demand

for personal reasons, an inappropriate activity constituting

misconduct;7 (ii) she had given confidential documents to a

person not entitled to possess them, an inappropriate

activity constituting gross misconduct;8 (iii) Singer

refused both to acknowledge this misconduct and to give any

reassurances that it would not be repeated; and (iv) the



7. According to the Bureau's report of the investigation, a
document separate and apart from LaFaver's letter, this
conduct constitutes grounds for disciplinary action.

8. According to the Bureau's report, this conduct
constitutes grounds for dismissal.

-16- 16

Bureau could no longer trust Singer with confidential Bureau

records. As a result, Singer was immediately placed on

administrative leave, and dismissed from the Bureau on

November 24, 1992. Although the letter also informed Singer

that she had a right to meet with LaFaver on November 23,

1992, to discuss her dismissal, Singer did not do so.

As has been stated, Singer and six other Bureau

employees had filed discrimination complaints with the MHRC

and the EEOC in February 1992. In November 1993, Singer

received right-to-sue letters from both agencies. On

February 8, 1994, she filed in the district court the suit

giving rise to this appeal.

We now turn to the only issue before us on appeal,

the question whether the individual defendants are entitled

to qualified immunity as to the 1983 Fifth Amendment claim.

II. Standard of Review II. Standard of Review

To the extent a district court order denying a

claim of qualified immunity turns on an issue of law, it is

an appealable final decision within the meaning of 28 U.S.C.

1291. Mitchell v. Forsyth, 472 U.S. 511, 530 (1985);

Cotnoir v. University of Maine Sys., 35 F.3d at 9. 

Where a qualified immunity defense is asserted by

pre-trial motion, the usual summary judgment standards apply.

Amsden v. Moran, 904 F.2d 748, 752 (1st Cir. 1990), cert.

-17- 17

denied, 498 U.S. 1041 (1991). Accordingly, summary judgment

is proper only if the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c).

III. Discussion III. Discussion

A. Qualified Immunity A. Qualified Immunity

1. 1.

It is undisputed that Singer was discharged from

the Bureau, in part, for her refusal to answer the questions

asked of her at the November 10 meeting. Defendants make two

arguments on appeal. First, they argue that their actions

did not violate Singer's Fifth Amendment rights according to

established precedent at the time of these events. Second,

they argue that there was no clearly-established right of a

public employee to refuse to answer employment-related

questions where: (i) the employer did not seek a waiver of

the employee's Fifth Amendment right against self-

incrimination; (ii) the employee did not actually claim the

Fifth Amendment privilege; and (iii) the employee's answers

were never used against her in a subsequent criminal

prosecution.

-18- 18

Qualified immunity shields public officials

performing discretionary functions "from liability for civil

damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a

reasonable person would have known." Harlow v. Fitzgerald,

457 U.S. 800, 818 (1982). The right alleged to have been

violated must have been clearly established at the time of

the alleged violation, id., and "[t]he contours of the right

must be sufficiently clear that a reasonable official would

understand that what he is doing violates that right."

Anderson v. Creighton, 483 U.S. 635, 640 (1987).

The qualified immunity analysis focuses on the

objective reasonableness of the defendant's actions. "[T]he

relevant question is whether a reasonable official could have

believed his actions were lawful in light of clearly

established law and the information the official possessed at

the time of his allegedly unlawful conduct." Febus-

Rodr guez, 14 F.3d at 91 (quoting McBride v. Taylor, 924 F.2d

386, 389 (1st Cir. 1991)) (other citation omitted). In

Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), the Supreme

Court characterized the qualified immunity defense as an

entitlement to "immunity from suit rather than a mere defense

to liability . . . . "

In applying these principles to a recent qualified

immunity determination, the Supreme Court stated: "A

-19- 19

necessary concomitant to the determination of whether the

constitutional right asserted by a plaintiff is `clearly

established' at the time the defendant acted is the

determination of whether the plaintiff has asserted a

violation of a constitutional right at all." Siegert v.

Gilley, 500 U.S. 226, 232 (1991). We subsequently cited

Siegert for the proposition that "before even reaching

qualified immunity, a court of appeals must ascertain whether

the appellants have asserted a violation of a constitutional

right at all." Watterson v. Page, 987 F.2d 1, 7 (1st Cir.

1993). Thus, as a predicate to the objective reasonableness

inquiry, "a plaintiff must establish that a particular

defendant violated the plaintiff's federally protected

rights." Febus-Rodr guez, 14 F.3d at 91 (citations omitted).

Applying these principles, the threshold question

in our qualified immunity analysis is whether Singer has

established that defendants violated her Fifth Amendment

right against self-incrimination. There is no indication in

the record that Singer at any time actually stated that she

was refusing to answer questions on Fifth Amendment grounds.

Instead, she simply remained silent on the advice of her

attorney and union representative.9 Under these



9. Moreover, at oral argument, Singer stated that she was
not coerced at the November 10 meeting.

-20- 20

circumstances, it would appear that there is a real question

as to whether Singer actually asserted a Fifth Amendment

violation.

In her brief, Singer states that "a constitutional

violation occurs when an employee is penalized for remaining

silent." Appellee's Brief at 21. In their brief, defendants

state that Singer did not invoke the Fifth Amendment at the

November 10 meeting, but instead refused to respond to the

questions asked because they were not job related.

Appellants' Brief at 25. These brief references

notwithstanding, the parties have not argued before this

court the question whether the Fifth Amendment requires that

one who seeks to invoke its protection must explicitly claim

the privilege, as distinct from simply exercising it by

remaining silent in the face of potentially incriminating

questions. Under the circumstances, we will assume, without

deciding, that Singer invoked the privilege against self-

incrimination.

2. 2.

As recently explained by retired Supreme Court

Justice Powell, the inquiry whether the right at issue was

clearly established properly focuses "not upon the right at

its most general or abstract level, but at the level of its

application to the specific conduct being challenged." Wiley

v. Doory, 14 F.3d 993, 995 (4th Cir. 1994) (quoting Pritchett

-21- 21

v. Alford, 973 F.2d 307, 312 (4th Cir. 1992)). "Moreover,

`the manner in which this [clearly established] right applies

to the actions of the official must also be apparent.'" Id.

(quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir.

1992)) (citations omitted) (alteration in original). "[I]f

there is a `legitimate question' as to whether an official's

conduct constitutes a constitutional violation, the official

is entitled to qualified immunity." Id. (quoting Tarantino

v. Baker, 825 F.2d 772, 775 (4th Cir. 1987)). 

We think that this perspective gives a clear view

of the qualified immunity issue.

B. The Fifth Amendment Rights of Public Employees B. The Fifth Amendment Rights of Public Employees

The Fifth Amendment states that no person "shall be

compelled in any criminal case to be a witness against

himself." U.S. CONST. amend. V. The Supreme Court has

addressed the Fifth Amendment rights of public employees in

the Garrity line of cases. See Garrity v. New Jersey, 385

U.S. 493 (1967); Gardner v. Broderick, 392 U.S. 273 (1968);

Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation,

392 U.S. 280 (1968). See also Lefkowitz v. Turley, 414 U.S.

70 (1973); Lefkowitz v. Cunningham, 431 U.S. 801 (1977).

In Garrity, police officers were compelled under

the threat of termination to answer incriminating questions

in the course of an investigation into traffic-ticket

-22- 22

"fixing." Prior to questioning, each officer was warned, in

accordance with a state statute, as follows:

(1) that anything he said might be used
against him in any state criminal
proceeding; (2) that he had the privilege
to refuse to answer if the disclosure
would tend to incriminate him; but (3)
that if he refused to answer he would be
subject to removal from office.

Garrity, 385 U.S. at 494.

The officers were not asked to sign a waiver of

immunity and there was no immunity statute applicable under

the circumstances. The officers answered the questions and

some of these answers were used against them in a later

criminal proceeding. The Court concluded that the officers

had been forced to choose between losing their jobs and

incriminating themselves, and held that their coerced

statements, "obtained under threat of removal from office,"

could not be used against them in subsequent criminal

proceedings. Id. at 500.

Gardner and Uniformed Sanitation Men both involve

public employees (in Gardner, a police officer; in Uniformed

Sanitation Men, municipal sanitation workers) who were

unconstitutionally "confronted with Hobson's choice between

self-incrimination and forfeiting [their] means of livelihood

. . . . " Gardner, 392 U.S. at 277; see also Uniformed

Sanitation Men, 392 U.S. at 284. In Gardner, a police

officer, who was subpoenaed to appear before a grand jury

-23- 23

investigating alleged bribery and corruption of police

officers, was advised as follows: (i) that the grand jury

intended to ask him questions concerning the performance of

his official duties; (ii) that he had a constitutional

privilege against self-incrimination; and (iii) that by law

he was required to sign a waiver of immunity or else be

fired. After he refused to testify and to sign the waiver,

the officer was given an administrative hearing and

discharged pursuant to a provision of the New York City

Charter, solely for his refusal to waive his Fifth Amendment

rights. Gardner, 392 U.S. at 274-75. Noting that the

officer "was discharged from office, not for failure to

answer relevant questions about his official duties, but for

. . . failure to relinquish the protections of the privilege

against self-incrimination," id. at 278, the Court held

unconstitutional both the officer's dismissal for his refusal

to waive his immunity and the Charter provision that

authorized it.

Significantly, the Court in Gardner and in

Uniformed Sanitation Men preserved the right of a public

employer to ask job-related questions of the employee:

If appellant, a policeman, had refused to
answer questions specifically, directly,
and narrowly relating to the performance
of his official duties, without being
required to waive his immunity with
respect to the use of his answers or the
fruits thereof in a criminal prosecution
of himself, the privilege against self-

-24- 24

incrimination would not have been a bar
to his dismissal.

Gardner, 392 U.S. at 278 (citation omitted); see also

Uniformed Sanitation Men, 392 U.S. at 284.

Justice Powell concludes that the "language in

these cases suggests that the right against self-

incrimination is not violated by the mere compulsion of

statements, without a compelled waiver of the Fifth Amendment

privilege or the use of compelled statements against the

maker in a criminal proceeding." Wiley v. Doory, 14 F.3d at

996 (citation omitted); see also Wiley v. Mayor of Baltimore,

--- F.3d ---, 1995 WL 85433, 3 (4th Cir. 1995); accord Hester

v. City of Milledgeville, 777 F.2d 1492, 1494 (11th Cir.

1985); Gulden v. McCorkle, 680 F.2d 1070, 1074 (5th Cir.

1982), cert. denied, 459 U.S. 1206 (1983); Uniformed

Sanitation Men Ass'n v. Commissioner of Sanitation, 426 F.2d

619, 627 (2nd Cir. 1970), cert. denied, 406 U.S. 961 (1972).

In United States v. Indorato, 628 F.2d 711, 716

(1st Cir.), cert. denied, 449 U.S. 1016 (1980), this court

summarized the Garrity line of cases in similar fashion,

noting the two features common to Garrity and its progeny: 

(1) the person being investigated is
explicitly told that failure to waive his
constitutional right against self-
incrimination will result in his
discharge from public employment (or a
similarly severe sanction imposed in the
case of private citizens); and (2) there
is a statute or municipal ordinance
mandating such procedure.

-25- 25

(Footnote omitted).

In Indorato, appellant, a state trooper who had

been convicted of conspiracy, theft and perjury, contended on

appeal that his statements in response to questions asked by

his superior officers during an investigation of the events

which gave rise to the charges were coerced, and therefore

inadmissible against him at trial under the Fifth Amendment.

Indorato, who was not in custody at the time he made the

statements, was not advised of his rights prior to

questioning and was not threatened with dismissal for refusal

to answer the questions asked of him.

Relying on Garrity, Indorato argued that the threat

of dismissal was nevertheless implied because he was being

questioned by superior officers and was well aware that the

departmental rules governing the state police provided for

the dismissal of officers who refused to obey the lawful

orders of superior officers. Under these circumstances,

Indorato viewed himself as having been put in the same

position as the officers in Garrity.

In rejecting Indorato's argument, we stated: "In

this case, there was no explicit `or else' choice and no

statutorily mandated firing is involved. We do not think

that the subjective fears of defendant as to what might

happen if he refused to answer his superior officers are

sufficient to bring him within Garrity's cloak of

-26- 26

protection." Indorato, 628 F.2d at 716. In holding that

there was no Fifth Amendment violation on these facts, we

said:

Here, defendant did not claim the
privilege. He was not told that he would
be dismissed if he failed to answer the
questions asked. He was not asked to
sign a waiver of immunity. There was no
statute mandating dismissal for refusal
to answer hanging over his head.
Defendant, here, was not, as in Garrity,
put between the rock and the whirlpool;
he was standing safely on the bank of the
stream.

Id. at 717 (citation and internal quotation marks omitted). 

Singer, like Indorato, did not explicitly claim the

privilege; was not told that she would be dismissed if she

failed to answer the questions asked of her; was not asked to

sign a waiver of immunity; and had no statute mandating

dismissal for refusal to answer hanging over her head.10

Accordingly, Singer was not put "between the rock and the



10. In Indorato, we said that the language used in the state
police departmental rules, which provided that a trooper may
be tried and upon conviction may be subject to dismissal or
other disciplinary action for violation of the rules,
"suggests that dismissal would not have automatically
followed defendant's invocation of the [F]ifth [A]mendment."
Indorato, 628 F.2d at 716. 
As stated in the text, here, there is no statute
mandating dismissal for refusal to answer questions.
Moreover, the language used in the Bureau's confidentiality
statement suggests that dismissal would not automatically
follow an employee's invocation of the Fifth Amendment:
"Unauthorized disclosure of any tax information may result in
immediate dismissal and imposition of penalties prescribed by
Maine and Federal statutes." Appendix p. 00080 (emphasis
added).

-27- 27

whirlpool," as were the plaintiffs in the Garrity line of

cases. Instead, like Indorato, she was "standing safely on

the bank of the stream."

Therefore, we must agree with defendants that their

actions did not amount to a violation of a clearly-

established Fifth Amendment right under Supreme Court and

First Circuit precedent at the time of these events. See

also In re Grand Jury Proceedings, 835 F.2d 375, 376 (1st

Cir. 1987) (the Fifth Amendment "does not shield a person

from every adverse social or economic consequence which may

flow from testifying," and is not violated where a public

employee who has been granted immunity is required to testify

before a grand jury investigating illegal activities)

(citation omitted); O'Brien v. DiGrazia, 544 F.2d 543, 546

(1st Cir. 1976) (Fifth Amendment rights of police officers

dismissed for refusing to complete a required financial

questionnaire as part of an investigation into their alleged

relationship with organized crime were not violated because

the "privilege is not infringed when public employees are

dismissed for failing to answer questions `specifically,

directly, and narrowly relating to the performance of their

official duties . . . . '" (quoting Uniformed Sanitation

Men, 392 U.S. at 284) (other citation omitted)), cert. denied

sub nom. O'Brien v. Jordan, 431 U.S. 914 (1977); accord

Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation,

-28- 28

426 F.2d at 627 ("The proceeding here involved no attempt to

coerce relinquishment of constitutional rights, because

public employees do not have an absolute constitutional right

to refuse to account for their official actions and still

keep their jobs . . . .").

In view of the divergence of opinion among the

circuits with respect to the various issues that circumscribe

the Fifth Amendment rights of public employees, we agree with

the defendants that the law in this area was unsettled at the

time of these events and remains so today.11

When viewed at the level of their application to

the specific conduct being challenged here, neither the

contours of the Fifth Amendment right itself, nor the manner

in which that right applies to the actions of these

defendants are at all apparent. Thus, whatever else may be

said of the law governing the Fifth Amendment rights of

public employees in these circumstances, it cannot be

maintained that it was then or is now clearly established.

We cannot conclude that defendants knew or should

have known that their actions violated Singer's clearly-



11. See Justice Powell's review of the federal law in this
area in Wiley v. Doory, 14 F.3d at 998 ("Today, approximately
six years after Doory's alleged conduct, the law remains
unsettled."); and in Wiley v. Mayor of Baltimore, 1995 WL
85433 at 4 ("We recognize that, in cases involving private
citizens, there is some inconsistency in the circuits
regarding whether or not a Fifth Amendment violation can
occur when the fruits of coerced questioning are not used.").

-29- 29

established Fifth Amendment rights. Indeed, it could be

reasonably argued that under the applicable law, there was no

Fifth Amendment violation at all. Accordingly, we hold that

defendants are entitled to qualified immunity as to the

1983 Fifth Amendment claim.

IV. Conclusion  IV. Conclusion

For the foregoing reasons, the district court's the district court's

order denying summary judgment to defendants on the Fifth order denying summary judgment to defendants on the Fifth

Amendment claim is reversed. No Costs. Amendment claim is reversed. No Costs.

-30- 30