UNITED STATES of America, Plaintiff,

v.

John S. NAJARIAN, Defendant.

Cr. No. 3–95–45.

United States District Court,
D. Minnesota,
Third Division.

Jan. 12, 1996.

Henry J. Shea, Janet A. Newberg and Mark D. Larsen, Assistant United States Attorneys, Minneapolis, Minnesota, for U.S.

Peter Thompson and John Lundquist, Thompson, Lundquist & Sicoli, Minneapolis, Minnesota, for Defendant.

## ORDER

KYLE, District Judge.

This matter is before the Court on Defendant's Objections to the December 27, 1995 Report and Recommendation ("R & R") of Magistrate Judge Raymond L. Erickson. This matter was referred to Magistrate Judge Erickson for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B).

The Defendant objects to the Magistrate Judge's recommendation to (1) deny Defendant's Motion to Dismiss Counts 1 through 4 of the Superseding Indictment on the grounds of vagueness and failure to state offenses; (2) deny Defendant's Motion to Dismiss Counts 1 through 4 of the Superseding Indictment on the grounds of estoppel; (3) deny Defendant's Motion to Dismiss Count 1, Paragraph 10(b) of the Superseding Indictment; (4) deny Defendant's Motion to Dismiss Counts 14, 23 and 24 of the Superseding Indictment; and (5) deny Defendant's Motion to Suppress Statement pursuant to *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

The Court reviews a magistrate judge's report and recommendation de novo and reviews a magistrate judge's order under the clearly erroneous standard. 28 U.S.C. §§ 636(b)(1)(C) and 636(b)(1)(A); *Banbury v. Omnitrition Int'l, Inc.*, 818 F.Supp. 276, 279 (D.Minn.1993).

The Court has independently reviewed the R & R, the materials filed in support of and opposition to Defendant's motions, the Transcript of the hearing held before the Magistrate Judge with respect to Defendant's Motion to Suppress under *Garri-*ty, the Defendant's Memorandum in Support of his Objections to the R & R, and the Government's response. The R & R is thorough, well-reasoned, and exhaustively assesses the Defendant's claims and the applicable law. The Court concurs with the Magistrate Judge's legal analysis and finds his factual findings with respect to *Garrity* to be fully supported by the record.

Accordingly, based on the foregoing and a de novo review of all the files, records, and proceedings herein, the Court will **ADOPT** the Report and Recommendation dated December 27, 1995 (Doc. No. 183) and **IT IS ORDERED** that:

(1) Defendant's Motion to Dismiss Counts 1 through 4 of the Superseding Indictment on the grounds of vagueness and failure to state offenses (Doc. Nos. 41 and 74) is **DENIED;**

(2) Defendant's Motion to Dismiss Counts 1 through 4 of the Superseding Indictment on estoppel grounds (Doc. No. 45) is **DENIED;**

(3) Defendant's Motion to Dismiss Count 1, Paragraph 10(b) of the Superseding Indictment (Doc. No. 43) is **DENIED;**

(4) Defendant's Motion to Dismiss Counts 14, 23 and 24 of the Superseding Indictment (Doc. No. 131) is **DENIED;**

(5) Defendant's Motion to Suppress Statement pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967) (Doc. No. 65) is **DENIED.**

## ORDER and REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

At Duluth, in the District of Minnesota, this 27th day of December, 1995.

### Crim. No. 3–95–45(1)

#### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A) and (B), upon the following Motions of the Defendant:

1. An Amended Motion to Dismiss Counts 1 through 4 of the Superseding Indictment on Vagueness and Due Process Grounds.[1]

2. A Motion to Dismiss Counts 1 through 4 of the Superseding Indictment on Estoppel Grounds.

3. A Motion to Dismiss Count 1, Paragraph 10(b) of the Superseding Indictment.

4. A Motion to Dismiss Counts 14, 23 and 24 of the Superseding Indictment.

5. A Motion to Suppress Statement.

A Hearing on these Motions was conducted on November 8 and 9, 1995, at which time the Defendant appeared personally and by Peter Thompson and John W. Lundquist, Esqs., and the Government appeared by Henry J. Shea, Mark D. Larsen, and Janet A. Newberg, Assistant United States Attorneys.[2]

For reasons which follow, we recommend that the Motions be denied.

## II. *Findings of Fact*

In a 52–page, 21–Count Superseding Indictment, that was filed on July 19, 1995, the Defendant was charged with one Count of participating in a conspiracy to defraud the United States, in violation of Title 18 U.S.C. § 371;[3] with one Count of willfully making a false statement, in violation of Title 18 U.S.C. § 1001; with two Counts of failing to report to the Food and Drug Administration ("FDA"), an adverse experience, purportedly related to the use of an experimental drug, in violation of Title 21 U.S.C. §§ 331(e), 355(i) and 333(a)(2), and 21 C.F.R. § 312.32(c); with one Count of conspiring to commit offenses against the United States, in violation of Title 18 U.S.C. § 371; with two Counts of theft and embezzlement from the University of Minnesota, in violation of Title 18 U.S.C. §§ 666 and 2; with seven Counts of mail fraud, in violation of Title 18 U.S.C. §§ 1341 and 2; with five Counts of willfully filing a false tax return, in violation of Title 26 U.S.C. § 7206(1); with one Count of obstructing an administrative proceeding of the FDA, in violation of Title 18 U.S.C. §§ 1505 and 2; and with one Count of willfully obstructing the due administration of justice, in violation of Title 18 U.S.C. §§ 1503 and 2. The events which precipitated these charges, and which are germane to the Motions before the Court, may be briefly summarized.

The charges pending against the Defendant arise from the development, the clinical investigation, and the marketing of Antilymphocyte Globulin ("ALG"), a biologic drug product that is administered to suppress the immune response, and to prevent and treat the rejection of transplanted organs.[4] In

---

1. On June 12, 1995, the Defendant filed a Motion to Amend his Motion to Dismiss Counts 1 through 4 on vagueness grounds, so as to add an argument that the Food and Drug Administration's ("FDA's") "cost recovery" regulatory scheme is unconstitutionally vague. At the Hearing in this matter, we granted the Motion to Amend.

2. At the conclusion of the Hearing, both parties requested leave to file supplemental briefing and, leave having been granted, the last of the parties' briefing was completed on November 24, 1995. We have now reviewed the supplemental briefs, and the issues are ripe for determination.

3. Rule 12(e), Federal Rules of Criminal Procedure, provides that, "[w]here factual issues are involved in determining a motion, the court shall state its essential factual findings on the record." Except as supplemented by the Court's recitation of factual findings, in the portion of this Opinion that addresses the Defendants' Motion to Suppress Statement, the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.

Necessarily, in drawing these factual findings, we have relied heavily upon the well-pleaded allegations of the Superseding Indictment which, for purposes of the Defendants' Motions to Dismiss, are taken as true. See, *United States v. Andreas*, 374 F.Supp. 402, 406 (D.Minn.1974); *United States v. J.R. Watkins Company*, 16 F.R.D. 229, 234 (D.Minn.1954); see also, *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 174–75, 9 L.Ed.2d 136 (1962); *United States v. Luros*, 243 F.Supp. 160, 165 (S.D.Iowa 1965), cert. denied, 382 U.S. 956 (1965). Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require. *United States v. Moore*, 936 F.2d 287, 288–89 (6th Cir.1991), cert. denied, 505 U.S. 1228, 112 S.Ct. 3052, 120 L.Ed.2d 918 (1992); *United States v. Prieto–Villa*, 910 F.2d 601, 610 (9th Cir.1990).

4. According to the Superseding Indictment, unlicensed biological drug products—such as ALG—which are used to cure, mitigate, treat or prevent disease, are regulated as new drugs by the FDA.

addition to being a medical doctor and the former Chairman of the Department of Surgery at the University's Medical School, the Defendant is charged with being a sponsor of, and a clinical investigator with, the Minnesota ALG Program, during the period from January of 1971 through August of 1992. In those capacities, the Defendant would be responsible for preparing and signing various reports to the FDA in order to conduct any clinical studies of ALG that would involve human subjects. Beyond reporting any adverse clinical experiences that were associated with ALG, the Defendant

was obliged to assure that the study was conducted according to its protocol, was subject to the monitoring of an institutional Review Board, and was being conducted only upon patients who had provided their "informed consent" to participate in the investigation.

According to the Indictment, in his efforts to develop, to clinically study, and to market ALG, the Defendant engaged in a criminal conspiracy whose object was to enhance the Defendant's "personal power and prestige through financial gain and otherwise." The Indictment charges that the Defendant ac-

Although disputed by the Defendant, at least in the Government's view, the Rules and Regulations of the FDA impose a number of obligations upon those who would seek to clinically investigate a new drug through the means of a human study. In order to secure FDA licensure for a new drug, the manufacturer is required to submit a license application to the FDA, which would properly demonstrate, on the basis of clinical data, that the new drug is safe, pure and potent for its intended use. If the FDA determines that the new drug is appropriate for licensing, then a license would issue which would authorize the marketing of the drug.

When a new drug has yet to receive FDA licensure, the manufacturer may only conduct clinical studies, which involve that drug, by securing appropriate authorization from the FDA. Such authorization is dependent upon the manufacturer's submission to the FDA, of a "Notice of Claimed Investigational Exemption" ("IND"), which is intended to demonstrate that the drug is reasonably safe for testing on human beings. In the event that the FDA should not disapprove of the IND, within a 30–day period after its filing, the IND would become effective, and the manufacturer would have the FDA's authorization to conduct clinical studies with the new drug, even though unlicensed. Those manufacturers, who hold an effective IND, are obligated to furnish the FDA with full, accurate and timely reports that permit the FDA to monitor the safety and effectiveness of the new drug on a continuing basis. Among other information, the manufacturer's report must disclose any adverse experiences that have been associated with the use of that new drug.

Again, according to the Superseding Indictment, the Defendant, as a sponsor of ALG, was required to monitor the drug's clinical investigations and to advise the FDA of their progress. The sponsor of clinical studies, that are being conducted under the auspices of an IND, is also required to report, by telephone, all unexpected fatal and life-threatening experiences to the FDA, within three working days after the receipt of the pertinent information. In addition, sponsors are required to report, to the FDA, all serious and

unexpected adverse experiences, that are associated with the use of a new drug, by no later than ten working days after being informed of such an experience.

As alleged in the Superseding Indictment, in his capacity as a clinical investigator, the Defendant was required to prepare and sign a "Statement of Investigator" prior to the conduct on human subjects of an investigational study, such as that employed with ALG. By signing that Statement, the Defendant would be certifying that, as a clinical investigator, he knew of the FDA's requirements and would properly comply. In addition, a clinical investigator, who is conducting a study under an IND, is obliged to conduct the study in accordance with the procedures enunciated in the study's protocol, and to prepare and maintain adequate records. If the investigation involved human subjects, then the clinical investigator is obligated to secure the review and approval of an institutional Review Board, and the "informed consent" of the participating patients. By operation of Federal Regulations, "informed consent" requires that the patient be informed that the study involves research, and be advised of any reasonably foreseeable risk or discomfort.

In contrast, the Defendant urges that he was not a "sponsor" of the ALG program, and that his actions, as a clinical investigator, were not subject to the Food, Drug and Cosmetic Act ("FDCA"), Title 21 U.S.C. § 301 *et seq.*, or any of the FDA's Regulations that were promulgated pursuant to that Act. Further, the Defendant maintains that the Public Health Services Act ("PHSA"), Title 42 U.S.C. § 201 *et seq.*, which regulates "biological products," does not authorize the promulgation of administrative regulations, nor does it permit the imposition of any criminal sanctions in excess of a misdemeanor offense. See, *Title 42 U.S.C. § 262(f).* Alternatively, the Defendant argues that, if the FDCA and any related Regulations do apply to the ALG program, then the definitions of the terms "adverse reaction" and "informed consent," and the parameters concerning "cost recovery," were unconstitutionally vague.

complished this object "by making materially false statements to the FDA, by failing to report material matters to the FDA, and by submitting fraudulent documents to the FDA, in repeated efforts to impede, impair, and obstruct the lawful governmental functions of the FDA."[5] Specifically, the Indictment alleges that the Defendant sold ALG for a profit, all the while denying such sales to the FDA;[6] that, in violation of FDA regulations, the Defendant failed to obtain "informed consents" from his patients who received ALG in the course of the Defendant's clinical investigation of the drug; that the Defendant made false statements to the FDA and the University concerning the identity, frequency and severity of any "adverse experiences" associated with the administration of ALG, including the failure to report nine known, fatal reactions to the drug;[7] and that, as a result of the adverse reactions which were associated with a specific lot of ALG, the Defendant replaced that lot at the University, but did not recall the shipments from the same lot which had been sold to other transplant centers.

The Superseding Indictment also charges the Defendant with a conspiracy to commit offenses against the United States that arose from the University's receipt, during the period that is relevant to the Indictment, of substantial monetary grants from the National Institutes of Health ("NIH"). Indeed, according to the Superseding Indictment, during the period between 1986 and 1992, the University's Medical School, alone, received in excess of $349,000,000.00 in NIH grants for medical and scientific research. In this respect, the Superseding Indictment asserts that the Defendant misappropriated funds from the University, which had been provided via these NIH grants or through the sale of ALG, by charging the University for travel expenses that had already been charged to the organization for whose benefit the expenses were incurred—a practice that is referred to as "excess reimbursement" or "double-billing." Specifically, the Indictment contends that, on at least sixty occasions, during the period from prior to February of 1986 until about December of 1992, the Defendant submitted duplicative expense summaries and vouchers, by which

---

5. In part, the Defendant has moved to dismiss certain of these charges—namely, those contained in Paragraph 10(b) of Count 1 to the Superseding Indictment—contending that the charges were impermissibly premised upon the "defraud" clause of Title 18 U.S.C. § 371 when, according to the Defendant, the Government was obligated to predicate such charges upon specific statutory provisions, such as those contained in Title 21 U.S.C. §§ 331 or 355(i). The Government disputes this contention.

6. The Superseding Indictment asserts that, during the period from January of 1971 through August of 1988, the Defendant sold ALG in interstate commerce, without FDA licensure, and received total revenues, through the University's Department of Surgery, in excess of $55,000,-000.00. Further, the Indictment contends that, notwithstanding the FDA's directive that the Defendant stop charging for the sale of ALG at a price that exceeded its cost, the Defendant completed sales of the drug to the University, during the period from August to December of 1988, and received approximately $358,710.00. The Indictment also alleges that, from May of 1989 to August of 1992, the University received gross revenues in excess of $24,000,000.00 for sales of ALG. According to the Indictment, FDA regulations prohibited the Defendant from selling ALG for more than the cost of producing the drug, and yet the Defendant was selling ALG at a profit

since, allegedly, the cost of producing ALG was one-third of its sales price.

For his part, the Defendant contends that the FDA was fully knowledgeable and acquiescent in the fees that were being charged by the University for ALG and that, therefore, the Government should be estopped from pursuing criminal charges against the Defendant with respect to Counts 1 through 4 of the Superseding Indictment.

7. Paragraphs 40, 42, 44, 45, 46, 47, 50, 54 and 55, of Count 1 of the Indictment, charge the Defendant with failing to inform the FDA of nine patients, who are identified by their initials, as having died during the twenty year period from 1969 through 1989, purportedly for causes associated with their exposure to ALG. One other patient, who is identified in paragraph 47 of Count 1, allegedly sustained severe damage to a transplanted kidney which, assertedly, the Defendant also failed to report to the FDA. Notwithstanding these instances of alleged adverse consequence, the Indictment contends that the Defendant reported to the FDA, in 1989, "that there had been *no* deaths and *no* serious adverse reactions associated with the use of ALG," and that, in 1992, he reported to the University's Regents that, in the past 20 years, there had been no more than three deaths attributable to ALG, and that those deaths had been caused by an improper administration of the drug.

he is purported to have been excessively reimbursed. Assertedly, during the period from January of 1988 to December of 1992, the excess reimbursements totalled the approximate amount of $76,000.00.

These same claims of "double-billing" underlie a number of the mail fraud charges that have been leveled against the Defendant but, in addition, the Superseding Indictment alleges that the Defendant, with others, defrauded the University by appropriating, for his own personal use, funds that had been paid to him in order to defray certain clerical expenses that were incidental to his service as a joint Editor of a medical journal entitled *Clinical Transplantation.* The Indictment contends that, during the period from May 17, 1988 through December of 1994, the Defendant appropriated some $35,000.00 for his own use, while employing secretarial services, for the completion of these editorial-like functions, purportedly at the expense of the University.[8] As a result of the use of the mails, in transmitting certain of the expense-related disbursements to the Defendant, he is also charged with mail fraud and with theft and embezzlement from the University. As well, the Indictment asserts five Counts of filing false income tax returns, which relate to the taxable years from 1988 through 1992, inclusive, and which arise from the Defendant's asserted failure to report the travel reimbursements, and the expense allowances for clerical support, as his own personal income.

Beyond these allegations, the Indictment contains two Counts which maintain that the Defendant engaged, directly or indirectly, in the destruction of inculpatory evidence. The first of these Counts asserts that, around September of 1992, employees of the University discovered an ALG-related letter that the Defendant wrote to the late James E. Coggins ("Coggins"), who had served as the Senior Administrator at the University's Department of Surgery, and who had been a subordinate of the Defendant. Apparently, this letter described a visit that Richard Condie, who then served as the Director of the Minnesota ALG Program, made to the Defendant and, purportedly, the letter contained a statement to the effect that "what we are doing with ALG may well be illegal." The Indictment goes on to relate that, assertedly, the Defendant advocated that both he and Coggins should destroy their respective copies of that letter. No copies of that letter are currently known to exist, and the Superseding Indictment contends that the loss of the letter had its intended effect in obstructing the course of a duly authorized FDA inquiry into the investigational administration of ALG.[9]

The second of the obstruction Counts maintains that the Defendant was instrumental in destroying certain travel records which related to his travel reimbursements for the years 1988, 1989, and 1990.[10] According to the Indictment, some of these documents had been made available to the Defendant's attorneys, or to their investigators, but the Defendant is said to have failed to produce the documents to the University's counsel who had been designated to respond to the Grand Jury's subpoenas in this matter. The Government contends that the documents were

---

**8.** The Defendant seeks the dismissal of Count 14 to the Superseding Indictment on the ground that the allegations surrounding the expense allowance payments, from the publishers of the medical journal, fail to state an actionable criminal offense or, alternatively, are multiplicitous of those charges contained in Counts 11 through 13 of the Indictment, which allege mail fraud, in violation of Title 18 U.S.C. §§ 2 and 1341. The Government has challenged these objections to the Superseding Indictment.

**9.** The allegations surrounding the Defendant's purportedly incriminating letter to Coggins are also challenged by the Defendant as warranting a dismissal. In support of this argument, the Defendant asserts that the allegations fail to ade-

quately state a criminal offense or provide notice of an offense, and suffer from vagueness, particularly to the extent that Title 18 U.S.C. § 1505 utilizes the term "corruptly." The Government opposes the Motion to Dismiss Count 23 of the Superseding Indictment.

**10.** The Defendant has moved to dismiss Count 24 of the Superseding Indictment, which relates to his purported destruction of allegedly incriminating travel records, on the ground that the allegations do not support a criminal offense, under the laws of the United States, or, alternatively, because Title 18 U.S.C. § 1503(a), upon which the Government relies, is unconstitutionally vague. The Government has opposed the Defendant's Motion to Dismiss Count 24.

known to exist prior to the time that the other travel documents were forwarded to the University's legal counsel. For the years 1989 and 1990, counsel for the Defendant did lodge some 43 pages of documents with the District Court, the Honorable David S. Doty presiding, subject to an asserted work product privilege.[11] By Order dated April 27, 1995, the District Court, in effect, rejected the claimed privilege and directed counsel for the Defendants to produce the 43 pages to the Grand Jury.

With respect to his Motion to Suppress his statement, the Defendant maintains that his interview with University officials, on February 9, 1993, was exacted by coercive means and, therefore, the contents of that interview should be suppressed as having violated the proscriptions of the Fifth Amendment to the United States Constitution. Being highly fact-intensive, we detail, somewhat exhaustively, the factual Record that bears upon this Motion.

The factors, which precipitated the February 9 interview, were culminating since at least mid-August of 1992, when representatives of the FDA visited the University and placed a hold upon the ALG program. Thereafter, for a period of several months, the Defendant engaged in a series of interviews, that were conducted either by members of the media or by representatives of the University. According to the Record before us, the Defendant responded to questioning, during an appearance on the "Almanac" television program on August 23, 1992; he was interviewed by newspaper journalists on August 25 and October 28, 1992; and he personally appeared before a Committee of the Whole of the University's Board of Regents, on September 10, 1992. On each occasion, the Defendant was extensively questioned about the alleged improprieties in the conduct and management of the ALG program. Although the Defendant now suggests that, in retrospect, these appearances

may not have been wholly voluntary, he has not sought to suppress any of the statements that he there made. [T–2 at 83–84 and 96].

By mid-December of 1992, a Federal Grand Jury, within this District, began to issue subpoenas to the University and to the Defendant, among others, as a part of an investigation of the ALG program for criminal wrongdoing. As a result, the Defendant submitted, on December 31, 1992, a request for indemnification of any attorneys' fees, that he should incur in responding to the Grand Jury's investigation, in accordance with the University's published "Indemnification Policy." In pertinent part, that Policy provides:

> Furthermore, this policy shall only apply in those cases where the employee seeking a defense and indemnification has given prompt written notice of the action, suit or proceeding to the Regents of the University of Minnesota, has requested defense by the University and has provided complete disclosure and cooperation in the defense of the claim or demand.

As a part of his letter request to Dr. Nils Hasselmo ("Hasselmo"), the President of the University, the Defendant made the following representation:

> I have provided, and will provide, complete disclosure and cooperation in the defense of any claim or demand made against me with respect to my activities as a University of Minnesota employee.

In response, Hasselmo wrote a letter to the Defendant's attorney, Vance K. Opperman ("Opperman"), advising that the University was agreeable to advancing defense costs and fees, but with the initial amount being limited to $15,000.00—"subject to increases at the sole discretion of [Hasselmo]." Hasselmo's letter also contained the following proviso:

> The advancement of defense fees and costs is conditioned upon complete disclosure to and full cooperation with the University of

---

11. Apparently, the Defendant argued that an investigator, who was employed by counsel for the Defendant, had culled the pages in question from a larger grouping of documents and that, as a result of that selective process, the shroud of privilege insulated those pages from disclosure to the Grand Jury. The District Court, the Honorable David S. Doty presiding, found no occasion to definitively resolve the privilege issue, as he concluded that any purported privilege had to yield to the superior authority of the Grand Jury's subpoenas, which had previously been served upon the Defendant.

Minnesota, as specified in the Regents Policy, to the extent consistent both with the right to independent representation by defense counsel, and any obligation to comply with legitimate requests of the government.

With public concern over the alleged improprieties in the ALG program mounting, and with a continuing concern on the University's part that only justifiable defense costs should be reimbursed, the Central Administration of the University—and, in particular, its President—were becoming increasingly insistent that the Defendant submit to an interview, by the University's attorneys, concerning any irregularities in the ALG program.

While the subject of an interview had been orally discussed, the first formal, written request was submitted to Opperman in a letter from Janice M. Symchych ("Symchych"), an attorney who had been retained by the University, dated January 30, 1993. In addition to attaching an outline of the subjects that were contemplated for questioning, the letter advised, in part, as follows:

> The University would like to conduct the interview without any conditions attached, and without any promises of confidentiality, in order to ascertain the full facts regarding the ALG program.

Given the Defendant's standing as a managerial employee of the University, and as an individual who had requested indemnification for his defense costs, the University expected the Defendant's "prompt cooperation."

By February 1, 1993, the University had forwarded the first installment of documents to Opperman, which would be the subject of any interview, and the University had identified four topics as being of "special, prioritized interest;" namely, "the FDA protocol, adverse reactions, commercialization, and managerial and supervisory responsibility for the ALG program." On behalf of the University, Symchych also made the University's intention clear that the purpose of the interview would be to determine whether the interests of the University and the Defendant were "consonant with one another," and to determine "whether the University [would] proceed to take disciplinary action

with respect to those involved in the ALG program."

In a letter dated February 3, 1993, Opperman responded to the University's request for an interview, in part, as follows:

> As you know, in the absence of a joint defense agreement, I have advised Dr. Najarian not to participate in additional interviews. He has, of course, had a number of interviews already, including those with University counsel, Mark Rotenberg, and others.
>
> \*      \*      \*      \*      \*      \*
>
> Dr. Najarian has instructed me that it is his very strong wish to continue all interviews with University personnel as soon as that can be arranged, consonant with my understanding of the issues involved and the documents you have selected. I wish to repeat that I have advised Dr. Najarian that such interviews at this preliminary stage and in the absence of a joint defense agreement are unwise.
>
> \*      \*      \*      \*      \*      \*
>
> I don't want there to be any misunderstanding about these interviews. The absence of a joint defense agreement would almost certainly dictate no communications of any kind. Nevertheless, and solely because of my client's desire to continue complete and total cooperation, I suggested on Friday that we enter into a modified joint defense agreement.

Concurrent with these negotiations, and the exchange of correspondence between the attorneys, representatives of the University's Central Administration were personally meeting with the Defendant and imploring him to submit to an interview.

In particular, Dr. Robert Anderson ("Anderson"), who was then the University's Vice President for Health Sciences, personally conferred with the Defendant on two occasions during the week before the interview was conducted. In his position as Vice President, Anderson had supervisory responsibility over, among others, the Dean of the Medical School, to whom the Defendant reported as the Chief of the Department of Surgery. Previously, Anderson had appeared with the Defendant before the Regent's Committee of

the Whole, on September 10, 1992, and he was of the view that the Defendant would be able to "rebut, quickly and effectively," many of the allegations that had been directed against him. [T–1 at 61].[12] Accordingly, Anderson urged the Defendant not to "stonewall." *Id.* In response, the Defendant advised that his attorney had informed him, in unequivocal terms, that he should not participate in an interview. With that, Anderson's first meeting with the Defendant ended.

Within a day or so thereafter, Anderson returned to the Defendant and, again, stressed the importance of a meeting with University officials. Anderson was convinced that "not agreeing to the meeting was not an option" and, when the Defendant reiterated that his attorney was opposed to such a meeting, Anderson responded by saying: "[I]t's your ass." [T–1 at 70]. Although he did not explain the meaning of his comment to the Defendant, Anderson felt satisfied that the Defendant knew its intendment since both of them had participated in athletics and, in his view, the import of his statement was unmistakable.[13] Notably, Anderson did not attempt to be specific in his discussions with the Defendant, as witnessed by the following exchange:

> Q. Did you ever say to John Najarian that if you don't give this interview, we're going to penalize you financially?
>
> A. No.

Q. Did you ever say to him that if you don't give this interview, we're going to try and take action to have you terminated as a tenured professor at this University?

A. No.

Q. Did you ever say that if you don't give this interview, we're somehow going to try to take away your ability to practice medicine at the University Hospital, if you don't give this interview?

A. No.

[T–1 at 82–83].

Nor did Hasselmo ever advise Anderson that he would terminate, or seek to terminate, the Defendant's tenure—or otherwise "try and penalize him financially"—if he refused to consent to an interview. [T–1 at 83; T–1 at 96]. In Anderson's view, Hasselmo wanted to hear the Defendant's "story." [T–1 at 95]. Nevertheless, at the close of Anderson's second meeting with the Defendant, the issue of an interview was left unresolved, although Anderson felt that the Defendant would, ultimately, agree to participate. [T–1 at 70].[14]

Following his second meeting with the Defendant, Anderson reported to Hasselmo that he thought the Defendant would consent to an interview and, shortly thereafter, Hasselmo summoned the Defendant to his office. What occurred at this meeting is somewhat in dispute,[15] but the parties do agree that

---

**12.** Given the fact that the pages of the two volumes of transcript are not numbered consecutively, we designate the transcript of November 8 as "T–1" and the transcript of November 9 as "T–2."

**13.** At the Hearing in this matter, Anderson explained the meaning, that he attached to his statement, as follows:

> I meant that it was his ass. That I thought there were two courses of action, one would be a legal course in which somebody would fill out the necessary papers to force him to appear to discuss it, or that he would be relieved of his administrative position within the medical school.

[T–1 at 70].

As Anderson conceded, however:

> * * * I never defined what ["It's your ass"] meant. I hoped he understood it the same way I did.

[T–1 at 80].

**14.** At some point between the meetings between Anderson and the Defendant, Cherie Perlmutter

("Perlmutter"), who was then the Associate Vice President of Health Sciences, also met with the Defendant to reinforce Anderson's message as to the importance of a meeting between Hasselmo and the Defendant. [T–1 at 129]. According to Perlmutter, the Defendant responded that "his attorney had advised him not to do it." [T–1 at 130].

**15.** Hasselmo contends that the Defendant "very readily and willingly said that, yes, he would participate in such an interview." [T–1 at 245]. In contrast, the Defendant describes this session with Hasselmo as "a very curt, short meeting in which I was told what to do." [T–2 at 33]. In the Defendant's words:

> I told him that I thought that it was unfair at this point to, one, cancel the trip [to Egypt]; and that, two, that I would agree to the interview if he demanded that I do so, which he did.

*Id.*

Hasselmo requested the Defendant to participate in an interview and to postpone a planned trip to Egypt in order to be available at an early date. The Defendant agreed to both requests. Hasselmo has explained his insistence upon an interview in the following terms:

> [W]hat drove my decision and my desire for an interview was to try to give Dr. Najarian an opportunity to respond to what were increasingly serious charges against the ALG program before I took action that might involve removing him from responsibility for that program and possibly from responsibility for the surgery department. It was—they were serious matters that had been put before me, and I felt that I needed to give Dr. Najarian a chance to respond to those charges before taking action, although I could take action without such an interview.

[T–1 at 238–39].

According to Hasselmo, he would not have disciplined the Defendant for refusing to conduct an interview and, as corroborated by Anderson, Hasselmo had not advised Anderson that, should the Defendant decline to be interviewed, he would be penalized in one form or another. As Hasselmo explained it:

> I had evidence before me that was quite serious, and I was prepared to act on that evidence, but the fact that he would refuse to submit to an interview or that he would refuse to respond to questions during an interview would not have been reason for me to take separate action against him.

[T–1 at 262].

Hasselmo does acknowledge that, during his meeting with the Defendant, he did inform him that he was contemplating disciplinary action against those involved in the ALG program, [T–1 at 271–72], and he readily admits that, with mounting pressure from the media and from the Regents, he felt a sense of urgency in having an interview completed. [T–1 at 266].

Concerned about Hasselmo's direct contact with the Defendant, Symchych telephoned Opperman to inform him that she had just learned that a private meeting was being conducted. According to Symchych, and her testimony has not been controverted, Opperman told her "that it was okay with him that his client was meeting personally with President Hasselmo" and, as Symchych recalled it, Opperman stated that Hasselmo "could talk to Dr. Najarian until he was blue in the face, and that wouldn't stop him from talking with President Hasselmo." [T–2 at 165].

As the date of the Hearing approached, Opperman continued to press the University for a joint defense agreement. With equal adamance, the University continued to reject those overtures and, by February 5, 1993, Opperman began to actively research alternative sources of privilege which would preclude the Government's use of the interview in its criminal investigation of the ALG program.[16] As the Defendant put the matter, while he had nothing to hide and wanted to tell his side of the story, by this time, he "was becoming a target." [T–2 at 38 and 41]. Approximately four days before the interview, Opperman's research focused upon the doctrine espoused by the Supreme Court in *Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967).[17] Un-

---

**16.** During a meeting of the attorneys for the respective parties, on January 29, 1993, Opperman announced the following ultimatum:

No interview without a joint defense agreement. We had to have privilege protection. We had to have a joint defense agreement. [T–1 at 158].

From that early date, the University rebuffed any approach that would include a joint defense agreement. As recounted by Opperman:

What [the University's attorney] said was that he gave a little comment about how the University was not prepared to enter into a joint defense agreement, that they had a duty both

to the Regents and the legislature to get to the bottom of things, to do their own investigation; and they would not be entering into joint defense agreements with individual defendants. [T–1 at 159].

Although not verified by anyone else, Opperman's notes of the January 29 meeting also reflect the statement of the University's attorney that, "if an individual is unwilling to answer questions, then the University will take appropriate action." [T–1 at 159].

**17.** The timing of *Garrity*'s appearance in the Defendant's discussions with Opperman is unclear. [T–1 at 165]. However, it is clear that

der *Garrity*, a public employee—such as the Defendant—is not required to either forfeit his right to silence, or forfeit his public employment. In the Defendant's words:

> [Opperman] was working towards—the one thing that he continued to strive for was a joint defense agreement, and was making little progress in that area.
>
> He advised me that if we don't have that privilege or the privilege of the Fifth Amendment, that we would have to seek another privilege, and that's the first time I heard the word Garrity.

[T–2 at 30–31].

Although never reduced to a written communication between the attorneys, the Record confirms that, on February 6, 1993, Opperman telephoned Symchych at her home in order to advise that he would be invoking the *Garrity* doctrine on his client's behalf. Symchych was unimpressed as she had felt that, if the Defendant, or his attorney, were concerned about being compelled to speak, that concern would have been documented in the correspondence which had previously been exchanged by the parties. [T–2 at 138–39].

On February 9, 1993, the Defendant's interview commenced at approximately 7:30 a.m., and concluded at approximately 6:00 p.m. The Record is uncontroverted that, at the commencement of the interview, Opperman made an oral statement which, as pertinent here, he has described as follows:

Opperman did not research the *Garrity* decision until on or about February 5, 1993. [T–1 at 182–83].

Opperman has related that he explained *Garrity* to the Defendant in the following terms:
Well, I told him that in the absence of [a] joint defense agreement—that we apparently weren't going to be able to get that. We had had some success, and we were starting to get documents, at least, but that it was my view that he had to go forward with the interview; that he would be disciplined, that he would lose some of his employment, and those would be terminated if he refused.
Consequently, the only protection we had left that we could get for him was to assert Garrity, which we would continue to do, and which I would do at the hearing on Tuesday. And we went over the ramifications of that with the doctor.
[T–1 at 183–84].

> The first thing was this was a compelled interview, that Dr. Najarian faced disciplinary action and termination if he refused to participate in the interview, and for that reason we were going ahead with the interview.

[T–1 at 190].

All concede that the no one at the interview challenged Opperman's characterization of the interview as having been "compelled." There is evidence, however, that counsel for the University followed Opperman's statement with a reconfirmation that the contents of the interview were not confidential. [T–2 at 139].[18]

On this Record, the Defendant contends that the interview of February 9 should be suppressed as having been coerced in violation of his Fifth Amendment right to silence, while the Government asserts that the Defendant's resort to the *Garrity* doctrine is nothing short of an eleventh hour effort to create a privilege where none could properly lie.

### III. *Discussion*

A. *The Defendant's Amended Motion to Dismiss Counts 1 through 4 of the Superseding Indictment on Vagueness and Due Process Grounds.*

▇ Without benefit of pertinent legal authority, the Defendant contends that ALG, as a biologic product, is not subject to regulation under the Food, Drug and Cosmetic Act ("FDCA"), Title 21 U.S.C. § 301 *et seq.*, and

Notwithstanding these assertions by Opperman, there is no evidence before us that anyone, who held a responsible position with the University, expressly threatened the Defendant with a loss of employment, or with the denial of any other employment benefit, were he to refuse to be interviewed.

18. A summarization of the Defendant's Interview, that was prepared by one of the University's attorneys, reflects that Opperman's statement received the following response:

> Mr. Kahan ("Kahan") [an attorney with Hogan & Hartson, who had been retained by the University] made it clear that there was no joint defense agreement and that nothing that was discussed during the interview was subject to a privilege.

[Government Exhibit 8 at 2].
Symchych has corroborated this summarization of Kahan's response. [T–2 at 139].

that he was immune to the statutory and regulatory violations of which he is charged in the Superseding Indictment. We reject the contention as without merit.

Within the FDCA, a "drug," which is subject to regulation, is defined as including "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals." *Title 21 U.S.C. § 321(g)(B).* Without doubt, ALG qualifies as a "drug," within the meaning of the FDCA. The fact that ALG may also be subject to regulation under the Public Health Services Act ("PHSA"), Title 42 U.S.C. § 201 *et seq.,* is inconsequential. On at least two occasions, our Court of Appeals has concluded that "animal biologics," which are prescribed in the veterinary sciences, are subject to the FDA's regulatory supervision, and we have no reason to find that a biologic, that is experimentally administered to humans— such as ALG—is exempt from the same regulatory scheme. See, *Grand Laboratories, Inc. v. Harris,* 660 F.2d 1288, 1289 (8th Cir.1981) (*en banc*), cert. denied, 456 U.S. 927, 102 S.Ct. 1972, 72 L.Ed.2d 442 (1982); *United States v. Pro–Ag, Inc.,* 968 F.2d 681, 684 (8th Cir.1992).[19] The Defendant draws nothing to our attention that counsels a different result, and we find that the regulatory schemes of the FDCA and the PHSA are not mutually exclusive in administratively regulating the management of unlicensed biological products. See, *Title 21 U.S.C. § 392(b); Title 42 U.S.C. § 262(g).*

■ Alternatively, the Defendant argues that the regulatory scheme of the FDCA is unconstitutionally vague in requiring the Defendant to report to the FDA "serious and unexpected adverse experiences," that were associated with the administration of ALG, to obtain "informed consents" from those patients to whom he would be administering ALG, and to forego cost recovery charges for his distribution of ALG.[20] Of course, the constitutional concern arises when assertedly wrongful conduct is founded upon statutory language that "lacks sufficient definiteness that ordinary people can understand what conduct is prohibited," *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983), or that "encourage[s] arbitrary and discriminatory enforcement." *Id.; Fields v. City of Omaha,* 810 F.2d 830, 833 (8th Cir.1987). In short, the "void for vagueness" doctrine evolved "in part to ensure that poorly drafted or overly vague statutes are not used to ensnare the innocent." *United States v. Derezinski,* 945 F.2d 1006, 1010 (8th Cir.1991).

In support of his vagueness argument, the Defendant advances a series of hypotheticals which, admittedly, tend to suggest that, at least in some instances, a treating physician might experience some difficulty in ascertaining whether a particular clinical finding was attributable to the administration of ALG, or whether a written "informed consent" was

**19.** Notwithstanding the Defendant's assertion that FDCA's regulatory scheme was inapplicable to certain aspects of the ALG program by virtue of the fact that, on occasion, the drug was prescribed "intrastate" and not in "interstate commerce," we find the argument to have been rejected in *Grand Laboratories, Inc. v. Harris,* 660 F.2d 1288, 1290 (8th Cir.1981) (Court acknowledges the parties' recognition that FDCA "would validly give FDA power to regulate animal biologics sold intrastate, if an ingredient of the products had previously been transported interstate."), cert. denied, 456 U.S. 927, 102 S.Ct. 1972, 72 L.Ed.2d 442 (1982). Whether any particular prescription of ALG should wholly avert "substantially affecting" interstate commerce, so as to evade regulation by the FDA, is a sufficiently fact-driven determination as to preclude our ability to resolve the matter within the context of Rule 12, Federal Rules of Criminal Procedure. See, *Rule 12(b), Federal Rules of Criminal Procedure* ("Any defense, objection, or request which is capable of determination without the trial of

the general issue may be raised before trial."). Nor do we find the Supreme Court's holding in *United States v. Lopez,* —— U.S. ——, ——, 115 S.Ct. 1624, 1630, 131 L.Ed.2d 626 (1995), as commanding a different result. In *Lopez,* the Court concluded that the absence of an "evident commercial nexus" was fatal to criminal charges premised upon the commerce clause. Given the allegations of the Superseding Indictment, which we are obligated to accept as true for these purposes, we find no sparsity of showing that a direct, commercial nexus has been properly alleged.

**20.** Although the Defendant maintains that he was not a "sponsor" of the ALG program and, therefore, not obligated to fulfill the reporting responsibilities of a sponsor, the applicable Regulations do allow for a "sponsor-investigator" who bears the administrative burdens attendant to both positions. See, *21 C.F.R. § 312.3(b).*

infeasible. Of course, we can conceive of these theoretical possibilities without, as a matter of law, concluding that the requisite standards, for distinguishing lawful from unlawful conduct, were impermissibly vague. Generically, we find that none of the challenged terms or phrases are so facially vacuous as to ensnare the unwary, or to foil a Jury's informed judgment on the issue of guilt or innocence. At this preliminary stage, we are not empowered to usurp the proper functions of the Jury by weighing the conflicting factual showings so as to conclude that, in a specific instance, an "informed consent" was not achievable, or an "adverse experience" was beyond ascertainment.[21]

Similarly, we are obliged to leave to the Jury any determination of whether the FDA permitted cost recovery in the dispensing of unlicensed drugs and, if so, under what circumstances. On the Record before us, we find no cause to conclude that the applicable criteria, for adjudging unlawful conduct, has placed the Defendant at his peril for want of adequate notice of a chargeable offense, or that the Defendant will be subjected to an arbitrary or capricious meting of justice by a factfinder who is unguided by the governing law.

Therefore, finding no basis to dismiss Counts 1 through 4 on due process and vagueness grounds, we recommend that the Defendant's Motion be denied.

B. *The Defendant's Motion to Dismiss Counts 1 through 4 of the Superseding Indictment on Estoppel Grounds.*

■ The Defendant contends that the FDA knew about the manner in which the ALG program was being conducted at the University, and that the Government should now be estopped from prosecuting the Defendant for alleged conduct that the FDA had countenanced over the course of years. Whether an estoppel defense may be asserted against the Government, in the context of a criminal proceeding, we need not decide for, in any event, the defense is so fact-dependent as to withstand dismissal, as a matter of law, with relative ease.[22] Where, as here, there is conflicting evidence as to whether the elements of an estoppel defense can be shown, the issue is for a Jury to decide. See, *United States v. French*, 46 F.3d 710, 714 n. 6 (8th Cir.1995). Here, in contrast to the Defendant's assertion of official acquiescence, the Superseding Indictment alleges that, repeatedly, FDA officials attempted to correct irregularities in the conduct of the ALG program, but without success. Whoever should, ultimately, win out on that issue would necessarily be as a result of a Jury's determination. Accordingly, we recommend that the Defendant's Motion to Dismiss Counts 1 through 4, on estoppel grounds, be denied.

C. *The Defendant's Motion to Dismiss Count 1, Paragraph 10(b) of the Superseding Indictment.*

■ Relying heavily upon the holding in *United States v. Minarik*, 875 F.2d 1186 (6th Cir.1989), the Defendant maintains that the Government may not charge offenses under both subclauses of Title 18 U.S.C. § 371, which provides as follows:

---

**21.** Given the fact that the terms "adverse experiences" and "serious adverse experiences," and the requisites of "informed consent" are detailed in the FDA's Regulations, we find the Defendant's vagueness argument particularly attenuated. See, *21 C.F.R. § 312.32(a); 21 C.F.R. § 50.20–27*. Although we can expect Congress, and those administrators to whom Congress has so delegated its regulatory authority, to promulgate regulations which are reasonably definitive, we also must recognize that lawmakers function within the confines of a communicative language as opposed to a precise, mathematical formulation. See, *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 330–31, 96 L.Ed. 367 (1952).

**22.** In *United States v. French*, 46 F.3d 710, 715 (8th Cir.1995), the Court assumed, without deciding, that estoppel may be available in a criminal case, and the Court expressly noted its prior recognition of an "entrapment by estoppel" defense. *Id.* at 714 n. 6, citing *United States v. Austin*, 915 F.2d 363, 365–67 (8th Cir.1990), cert. denied, 499 U.S. 977, 111 S.Ct. 1626, 113 L.Ed.2d 722 (1991). In such a defense, the accused is required to prove that he was "misled by the statements of a government official into believing that [his] conduct was lawful." *United States v. La Chapelle*, 969 F.2d 632, 637 (8th Cir.1992). At this preliminary juncture, we cannot discount the possibility that the Defendant may be capable of invoking an "entrapment by estoppel" defense.

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years or both.

As is clear, Section 371 prohibits two distinct forms of conspiracy: 1) a conspiracy to commit a specific offense against the United States ("the offense clause"); and 2) a conspiracy to defraud the United States ("the defraud clause"). According to the Defendant, the Government should not be allowed to premise a conspiracy charge upon the generalized language of the Section's "defraud clause," when a specific statutory violation could be charged under the Section's "offense clause."

▮ Unfortunately for the Defendant, closely paralleling arguments have been considered—and rejected—by our Court of Appeals in *United States v. Sileven,* 985 F.2d 962, 965 (8th Cir.1993), and in *United States v. Derezinski,* supra at 1009–10. In doing so, the Court expressly observed:

> While it may be true that the Government could have also charged [the defendant] under the specific offense clause of section 371, it is well settled that when conduct violates more than one criminal statute, the Government may choose which statute it will apply. * * * The Government was within its discretion when it decided to prosecute [the defendant] under the general defraud clause of Section 371.

*United States v. Derezinski,* supra at 1010. Moreover, upon the same precedential authorities, we reject the Defendant's argument that Section 371 is unconstitutionally vague and overbroad—for the same argument was addressed and rejected in *Derezinski*—and we also reject his contention that the Superseding Indictment provided him with inadequate notice concerning the bases for the charges made—a contention that was spurned, on similar grounds, in *Sileven.* See, *United States v. Derezinski,* supra at 1010–11; *United States v. Sileven,* supra at 965. The Defendant draws no distinctions which would distinguish these holdings by our Court of Appeals, and our independent review has suggested none.

Nevertheless, as the Supreme Court has instructed, "vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975). We have carefully examined the twenty pages of Count 1, which is comprised of some twelve paragraphs which detail the "manner and means of the conspiracy," together with more than thirty paragraphs which have listed the "overt acts" at play here, as well as the respective protagonists and the time frames involved. As to Paragraph 10(b), it specifically charges the Defendant with "defraud[ing] the United States," by "hamper[ing], imped[ing], impair[ing] and obstruct[ing] by deceit and dishonest means, the lawful and legitimate functions of the FDA in its oversight of clinical investigations of experimental and investigational biological drugs." Under the test espoused in *Kolender v. Lawson,* supra, we conclude that an ordinary person would have no difficulty in understanding the charges that confront the Defendant, as expressed in the challenged Paragraph 10(b), and the bases for those charges. Accordingly, we recommend that his Motion to Dismiss that Paragraph be denied.

### D. *The Defendant's Motion to Dismiss Counts 14, 23 and 24 of the Superseding Indictment.*

Following the return of the Superseding Indictment, the Defendant filed his Motion to dismiss Counts 14, 23 and 24, which raised claims that had not been previously leveled. We address these Motions in the order presented by the parties.

▮ 1. *Count 24.* In Count 24, the Government charges that the Defendant obstructed the investigative efforts of the Grand Jury, in violation of Title 18 U.S.C. § 1503(a), which provides, in pertinent part, as follows:

Whoever corruptly * * * influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided by subsection (b).

The Government alleges that, with respect to his travel records, which relate to the ALG program, the Defendant consciously failed to produce those records to the Grand Jury, notwithstanding the Jury's subpoenas to that effect.

In contrast, the Defendant contends that the Superseding Indictment concedes that the Grand Jury's initial subpoenas did not require the production of the travel records at issue and, therefore, that the Defendant had no obligation to produce those records for the Grand Jury's inspection. As the Government urges, however, we read the allegations of Count 24 as presenting alternative theories as to the Defendant's wrongdoing. Under the first alternative, the Government contends that the initial Grand Jury subpoenas did encompass the travel documents which, the Government asserts, the Defendant was instrumental in assuring were never produced for the Grand Jury. Since the subpoenas are not before us, and in view of our obligation to view the allegations of a charging document as true in the context of a Motion to Dismiss, we have no basis upon which to conclude that a properly chargeable offense has not been raised.

As a second alternative, the Government alleges that, even if the original Grand Jury subpoenas did not require the production of the disputed travel records, the Defendant had a reasonable basis to believe that those documents were implicated in the legitimate scope of the Grand Jury's investigation and, therefore, that they should have been preserved. Relying upon the Supreme Court's recent decision in *United States v. Aguilar,* —— U.S. ——, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), the Defendant contends that there was not a sufficient nexus between the Grand Jury's investigations, and the Defendants response to the Jury's subpoenas, to support an obstruction charge under Section 1503. As the Court stated in *Aguilar:*

> [T]he act must have a relationship in time, causation or logic with the judicial

proceedings. * * * In other words, the endeavor must have the "natural and probable effect" of interfering with the due administration of justice. * * * This is not to say that the defendant's actions need not be successful; an "endeavor" suffices. * * * But * * * if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct.

*United States v. Aguilar,* supra —— U.S. at ——, 115 S.Ct. at 2362 [citations omitted].

We find the circumstances in *Aguilar* to be distinguishable from those presently confronting us. In *Aguilar,* the defendant was accused of making a false statement to an FBI agent and the Court concluded that, without more, such a misstatement did not implicate the defendant in obstructing a Grand Jury's investigation since there was no showing that the defendant knew that his comments would be presented to the Grand Jury. As the Court explained:

> [W]hat use will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is far more speculative. We think it cannot be said to have the "natural and probable effect" of interfering with the due administration of justice.

*Id.* at ——, 115 S.Ct. at 2363.

Of course, if—as the Government claims—the travel records at issue were responsive to the Grand Jury's subpoenas, then the nexus between the Defendant's purported acts, as they have been pled, would have "the 'natural and probable effect' of interfering with the due administration of justice." *Id.* at ——, 115 S.Ct. at 2362. Similarly, if the evidence, that should be adduced at trial, substantiates the Government's allegation that the Defendant had reason to believe that the documents in question were within the scope of the Grand Jury's investigation, then the nexus between the Defendant's asserted wrongdoing, we think, and the Grand Jury's administration of justice, would have a sufficiently close "relationship in time, causation or logic" as to legitimately support a submission of that issue to the Jury. Therefore, we reject

this aspect of the Defendant's Motion to Dismiss Count 24.

Moreover, we find unconvincing the Defendant's contention that the Section's employment of the term "corruptly" is impermissibly vague, merely because the Eighth Circuit's *Manual of Model Criminal Instructions* contains a variety of potentially applicable definitions for that term. As our Court of Appeals has addressed the issue of vagueness:

> The challenger of a statute "must demonstrate that the law is impermissibly vague in all of its applications," * * * and that the statute could never be applied in a valid manner. * * * Statutes should not be declared unconstitutionally vague by speculating about possible hypothetical applications. If a law is susceptible of a reasonable interpretation which supports its constitutionality, the court must accord the law that meaning.

*Planned Parenthood of Minnesota v. State of Minnesota,* 910 F.2d 479, 482 (8th Cir. 1990), quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497, 102 S.Ct. 1186, 1192–93, 71 L.Ed.2d 362 (1982).

Here, the Defendant has failed in his burden of demonstrating that the term "corruptly," as it is employed in Section 1503, is impermissibly vague in all of its applications. We are satisfied that, as the issue should properly arise, the Court will be able to craft a Jury Instruction which will accurately capture the meaning of that term, as Congress has intended.

Therefore, we recommend that the Defendant's Motion to Dismiss Count 24 be denied.

■ *2. Count 23.* In Count 23, the Government contends that the Defendant committed acts, in violation of Title 18 U.S.C. § 1505, which provides, in relevant part, as follows:

> Whoever corruptly, or by threats of force, or by any threatening letter or communication influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due and proper administration of the law under which any pending proceed-

ing is being had before any department or agency of the United States, * * * shall be fined under this title or imprisoned not more than five years, or both.

As underscored by the Defendant, this Count implicates him in the destruction of a writing in which the Defendant is alleged to admit that "what we are doing with ALG may well be illegal," or "words to that effect." Relying upon the Sixth Amendment's guarantee that a defendant be informed of the "nature and cause of the accusation," and the requirement of Rule 7(c), Federal Rules of Criminal Procedure, that an Indictment contain a "plain, concise and definite statement of the essential facts constituting the offense charged," the Defendant maintains that the allegations of Count 23 are so nebulous and incomplete as to warrant a dismissal. We disagree.

Although the Defendant accurately complains that the date of the writing at issue has not been detailed in the allegations of Count 23, the Count does specify the pertinent act of obstruction, and it identifies the writing, the author and the recipients of the writing, and the approximate date of the incident—namely, "in or about September 1992." As such, the allegations of Count 23 are far more fact specific than those stricken in *United States v. Abrams,* 539 F.Supp. 378, 385 (S.D.N.Y.1982), upon which the Defendant heavily relies. In *Abrams,* the challenged charge failed to allege any factual detail, but merely reiterated the statutory language which underlaid the asserted offense. As explained by the Court:

> They [i.e., the disputed allegations] do not name the persons alleged to have been prevented from communicating to federal authorities; they do not identify the criminal statutes to which the obstructed information pertained. Nor do they detail any of the alleged acts of bribery or misrepresentation, or identify with any precision the criminal investigation involved. While the absence of any one of these factual elements alone might not be a basis for finding the counts insufficient, * * * the effect of all these factors considered together requires that these counts be dismissed.

*Id.* at 385 [citations omitted].

We find the factual allegations of Count 23 to be sufficiently detailed so as to satisfy both the proscriptions of the Sixth Amendment and of Rule 7(c), Federal Rules of Criminal Procedure. See, e.g., *United States v. Upton,* 856 F.Supp. 727, 742–44 (E.D.N.Y.1994); *United States v. Jackson,* 850 F.Supp. 1481, 1499–1500 (D.Kan.1994); *United States v. Schwimmer,* 649 F.Supp. 544, 547–48 (E.D.N.Y.1986); *United States v. Vitale,* 635 F.Supp. 194 (S.D.N.Y.1986), cause dismissed, 795 F.2d 1006 (2nd Cir.1986).

As a consequence, we recommend that the Defendant's Motion to Dismiss Count 23 be denied.[23]

■ 3. *Count 14.* In Count 14, the Government alleges that the Defendant stole or embezzled property which belonged to the University—a State agency that was receiving Federal funds—in violation of Title 18 U.S.C. § 666. The Defendant contends that the allegations of Count 14 fail to specify that the Defendant was acting as the agent of the University and, in his view, the property in question—secretarial and clerical reimbursement checks—should properly be treated as "bona fide salary, wages, fees or other compensation paid, or expenses reimbursed, in the usual course of business," which are excepted from the coverage of Section 666. See, *Title 18 U.S.C. § 666(c).*

While the evidence adduced at trial may, ultimately, substantiate the Defendant's assertions, our obligation at this stage of the proceedings is to sustain the sufficiency of an Indictment "unless no reasonable construction can be said to charge the offense." *United States v. Morris,* 18 F.3d 562, 568 (8th Cir.1994), citing *United States v. Peter-*

*son,* 867 F.2d 1110, 1114 (8th Cir.1989). Here, a common sense reading of the Superseding Indictment, as an integrated whole, allows a reasonable inference that, with respect to the allegations of Count 14, the Defendant was acting as the agent of the University, and particularly in his role as a University professor and clinical investigator.

Moreover, whether the payments at issue were excepted from the proscriptive scope of Section 666 is, unavoidably, a fact-intensive question. The declarations of the Government aver—and the Defendant does not dispute—that he tendered two personal drafts to the University, in the approximate amount of $30,000, with a notation on the drafts that they represented payment for secretarial services for 1988 through 1993 in connection with the medical journal which serves as the focus of the offense asserted in Count 14. While, in and off itself, this act of repayment does not preclude an invocation of the exemption provided by Section 666(c), we think it does verify the fact-driven and, therefore, Jury-entrusted nature of the inquiry.

■ Lastly, we find no merit to the Defendant's contention that the allegations of Count 14 are multiplicitous of those contained in Counts 11 through 13. Offenses are separate and, therefore, not multiplicitous, if each offense requires proof of an element not required by the other. *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). Counts 11 through 13 are premised upon a violation of the mail fraud Statute, Title 18 U.S.C. § 1341, while, as we have noted, Count 14 rests upon a purported violation of Title 18 U.S.C. § 666. Unquestionably, these predicate Statutes require different elements of proof,[24] and impermissible multiplicity is not

---

**23.** For reasons previously expressed in the context of the Defendant's Motion to Dismiss Count 24, we do not find that the term "corruptly," as it is here employed in Section 1505, is unconstitutionally vague, nor does the Defendant cite any controlling authority to that effect. As the occasion should arise, we remain confident that a proper Jury Instruction can be submitted that will embody Congress's intent in selecting that term.

**24.** Section 666 requires the Government to establish that: 1) the Defendant was an agent of a State government or agency at the time of the

asserted offense; 2) that the Defendant embezzled, stole, fraudulently obtained or willingly converted property worth at least $5,000, which was under the control, care or supervision of the State government or agency; and 3) the above elements occurred at a time when the State government or agency received in excess of $10,000 in any one year from a qualifying Federal assistance program. See, *Title 18 U.S.C. § 666; United States v. Valentine,* 63 F.3d 459, 462 (6th Cir.1995). In contrast, Section 1341 requires proof of the following elements: 1) the existence of a plan or scheme to defraud; 2) the foresee-

presented. Therefore, the Motion to Dismiss Counts 14, 23 and 24, should be denied.

### E. *The Defendant's Motion to Suppress Statement.*

Were the issue before us simply one of ascertaining whether uncommon pressures bore upon the Defendant's decision to be interviewed, we would have no hesitancy in ruling in his favor. Without question, the Defendant was substantially influenced by a multitude of factors in consenting to an interview. Nor do we doubt that the University's interest in conducting an interview of the Defendant was anything short of formidable. Nevertheless, our reading of the governing law does not suggest that the *Garrity* doctrine is founded upon sophomoric naiveté.

As a recurrent human experience, we seriously doubt that any of life's truly dramatic decisions are unattended by the weighing of countervailing considerations which, almost ineluctably, are at great odds. Not surprisingly, therefore, we have yet to uncover any decision in which *Garrity* has been applied solely because a public employee was importuned to provide an interview—and the parties have not drawn one to our attention. Clearly, to evoke a *Garrity* response, something more is required than an employer's persistent request that questioning ensue. See, *Minnesota v. Murphy*, 465 U.S. 420, 435–36, 104 S.Ct. 1136, 1146–47, 79 L.Ed.2d 409 (1984) (recognizing that, beyond the "ordinary case in which a witness is merely required to appear and give testimony," the "extra, impermissible step" is the imposition of a penalty for the refusal to testify.) Of necessity, therefore, we first address the standard by which our analysis is focused.

In advancing their respective arguments, the parties have each championed an interpretation of the *Garrity* doctrine which, at least facially, conflicts with the other. For his part, the Defendant relies upon the District of Columbia Court of Appeals' decision in *United States v. Friedrick*, 842 F.2d 382, 395 (D.C.Cir.1988), in which the Court interpreted the *Garrity* rule as follows:

> Under the Garrity–Lefkowitz–Murphy line of authority, [the defendant] must have in fact believed his * * * statements to be compelled on threat of loss of job and this belief must have been objectively reasonable.

Accordingly, *Friedrick* is cited as espousing a two-pronged test in determining the applicability of *Garrity:*

> First, the defendant must have subjectively believed that he was compelled to give a statement upon threat of loss of job. Second, this belief must have been *objectively reasonable* at the time the statement was made.

> *United States v. Camacho*, 739 F.Supp. 1504, 1515 (S.D.Fla.1990) (emphasis in original).

In turn, the Government argues that the standard deployed in *Friedrick* is too detached and too expansive to properly guide the Court's analysis.

Instead, the Government relies upon the First Circuit Court of Appeals' decision in *United States v. Indorato*, 628 F.2d 711, 716 (1st Cir.1980), in which the Court summarized the *Garrity* rule as follows:

> In all of the cases flowing from Garrity, there are two common features: (1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment (or a similarly severe sanction imposed in the case of private citizens); and (2) there is a statute or municipal ordinance mandating such procedure.

---

ability that the scheme would cause the mails to be used; and 3) the use of the mails was for the purpose of carrying out the fraudulent scheme. See, *Title 18 U.S.C. § 1341; United States v. Shelton*, 36 F.3d 52, 53 (8th Cir.1994); *United States v. Goodman*, 984 F.2d 235, 237 (8th Cir. 1993).

We find nothing in the Defendant's reliance upon *United States v. Pintar*, 630 F.2d 1270, 1280

n. 13 (8th Cir.1980), which would counsel a different result. *Pintar* dealt with the possibility of "duplicity" between charges under Section 1341 and under a Title 18 U.S.C. § 3220 charge of embezzlement, and the interplay between Sections 1341 and 666 was not substantively addressed.

While somewhat more dated than the construction provided by the District of Columbia Court of Appeals, the interpretation expressed in *Indorato* has recently been reconfirmed by the First Circuit in *Singer v. State of Maine*, 49 F.3d 837, 846–47 (1st Cir.1995). Notably, however, neither the reading of *Garrity* in *Friedrick*, or in *Indorato*, has captured, in any predominant way, the adherence of those Courts that have followed.

In our view, the two lines of decision—and, necessarily, the cases upon which they are premised—are founded upon a Statute, Regulation, Ordinance or Rule which precludes the interrogee from refusing to be questioned except at the expense of his employment, or an equivalently significant economic penalty. To this extent, *Indorato* may present a reading of *Garrity* that is unnecessarily cramped, at least to the extent that *Indorato* speaks only in terms of a "statute or municipal ordinance," since *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967), applied the *Garrity* privilege, even in the absence of a "statute or municipal ordinance." On the other hand, we are not aware of any decision in which the *Garrity* rule was applied in the absence of a privilege-waiving Statute, Regulation, Ordinance or Rule, and solely because the interrogee was persuaded by forces, both internal and external, to explain those actions upon which the inquiry has focused.

Here, of course, no one seriously contends that any Statute, Regulation, Ordinance or Rule, required the Defendant to be interviewed or else face the loss of his employment.[25] Indeed, his counsel has testified that he was not aware of any policy, formal or informal, by which the University would terminate those who refused to be questioned about perceived on-the-job misconduct. [T–1 at 203 and 218]. Because we find no compulsion, based upon an authoritatively promulgated mandate, to have coerced the Defendant into providing a statement—at the pain of losing his employment—we find little in the reported decisions which is apposite here.[26]

In an analogous context, however, our Court of Appeals was confronted with a public employee who faced the same dilemma as that which confronted the Defendant on February 9, 1993. The Court framed the employee's predicament as follows:

> This appeal poses the difficult constitutional question of whether an indicted individual's fifth amendment privilege against self-incrimination is threatened if he must participate in an administrative proceeding, as the sole means of contesting the loss of his job, which involves consideration of matters related to or similar to those for which a criminal indictment has been issued. Even where, as here, the accused employee is free to assert the privilege in the administrative proceeding, the choices available to him are still undesirable. He may either elect to remain silent while the administrative commission hears evi-

**25.** There are policies which require an employee of the University to "cooperate," but this Record is bereft of any policy, which is here operative, that would penalize an employee with the loss of his University employment were he to refuse to consent to an interview.

While asserting that the University's Indemnification Policy was one means by which "the University compels people to testify," Opperman also related that it was not his testimony that the "indemnification policy had been applied to take an employee's job away when the employee failed to cooperate." [T–1 at 210]. More importantly, by his letter of December 31, 1992—while he was being represented by legal counsel—the Defendant represented that he had "provided, and [would] provide, complete disclosure and cooperation in the defense of any claim or demand made against me with respect to my activi-

ties as a University of Minnesota employee." We find no basis to conclude, on this Record, that the Defendant's interview of February 9, 1993, was compelled in the sense required by the *Garrity* doctrine.

**26.** The Defendant pointedly relies upon *United States v. Friedrick*, 842 F.2d 382, 396 (D.C.Cir. 1988), and *United States v. Camacho*, 739 F.Supp. 1504, 1508 (S.D.Fla.1990), but each of these decisions was premised upon an operative mandate that required the interrogee to allow official questioning, or face a job termination. Similarly, the Court's analysis in *Wiley v. Doory*, 14 F.3d 993 (4th Cir.1994), and in *Wiley v. Mayor and City Council of Baltimore*, 48 F.3d 773 (4th Cir.1995), cert. denied, — U.S. —, 116 S.Ct. 89, 133 L.Ed.2d 45 is unavailing for, there too, the interrogee's submission to a polygraph test was under threat of a job loss.

dence of his criminal conduct, and virtually guarantee the loss of his job, or he may voluntarily testify and waive the fifth amendment privilege.

*Diebold v. Civil Service Commission,* 611 F.2d 697, 698 (8th Cir.1979).

The Court concluded that "the dilemma forced upon the [employee] was a constitutionally permissible one." *Id.* at 699. As the Court explained:

> There exists here no requirement that [the employee] waive his immunity under the fifth amendment. Nor is there a threat that he will be fired simply for invoking that privilege. See *Baxter v. Palmigiano,* 425 U.S. 308, 317–18, 96 S.Ct. 1551, 1557–1558, 47 L.Ed.2d 810 (1976). ("In this respect, this case is very different from the circumstances before the Court in the Garrity–Lefkowitz decisions, where refusal to submit to interrogation and to waive the Fifth Amendment privilege, *standing alone and without regard to the other evidence,* resulted in loss of employment or opportunity to contract with the State.") (Emphasis added.). Since there is no showing that [the employee] must either answer questions which might incriminate him in future criminal proceedings or forfeit his job, we find no impermissible sanction in the Commission's rules.

*Id.* at 701.

The very same may be said here.[27] While we recognize that the Defendant, and his former counsel, have testified that the prospect of an interview provided the Defendant with no choice but to submit to the University's questioning, we are not persuaded that he was impermissibly threatened, with severe economic loss, if he were to invoke his Fifth Amendment rights.[28]

In appraising the evidence before us, we find, based upon his demeanor and upon those factors which properly bear upon the issue, that the Defendant has been something less than a fully credible historian, for his testimony is appreciably undermined by overstatement and by revisionism. Although we limit ourselves to two examples, they are intended to be illustrative and not exhaustive. As to the first, we note that, when questioned on direct examination about the content of his private meeting with Hasselmo, the Defendant testified as follows:

Q. * * * And did [Hasselmo] also ask you to cancel the trip?

A. He did.

Q. All right. And what was your response to what he was asking you to do?

A. I told him that I thought that it was unfair at this point to, one, cancel the trip; and that, two, that I would agree to the interview if he demanded that I do so, which he did.

And I think that's about it. It was a short meeting. He had always been rather pleasant to me. This was a very curt, short meeting in which I was told what to do.

Q. And at that point what did you view your options to be?

A. *I had no options. Either that if I did take the Fifth Amendment privilege, that either way he was going to remove me from office. He so stated.*

[T–2 at 33–34].

27. Moreover, the Court went on to observe that the fact that an indictment was pending against that employee, such that he might endure a greater threat to his Fifth Amendment rights, "had no bearing on the constitutional issues involved." *Diebold v. Civil Service Commission,* 611 F.2d 697 (8th Cir.1979). In so concluding, the Court favorably quoted, from the decision in *United States v. White,* 589 F.2d 1283, 1286 (5th Cir.1979), as follows:

[The employee] was not forced to surrender his privilege against self-incrimination in order to prevent a judgment against him; although he may have been denied his most effective defense by remaining silent, there is no indica-

tion that invocation of the fifth amendment would have necessarily resulted in an adverse judgment.

*Diebold v. Civil Service Commission,* supra at 701.

Once again, we find that the Court's observation has equal application to the circumstances presented here.

28. Finding no impermissible threat, we have no occasion to resolve the issue of whether the Defendant's removal, from the Chairmanship of the Department of Surgery, would equate with the dire economic consequences that have driven the Courts in the *Garrity* chain of cases.

Left unqualified, this testimony would have dramatically fortified the Defendant's insistence that Hasselmo demanded his waiver of his Fifth Amendment protections—at the threat of his removal from office. Nevertheless, when questioned on this same subject during the course of his cross-examination, the Defendant testified as follows:

Q. Did you testify today that President Hasselmo made some reference to the Fifth Amendment, that if you took the Fifth Amendment, he would remove you from office?

[Objection to question as a misstatement of the Defendant's testimony overruled.]

A. Those words were not used. I said—I asked him what would happen if I didn't. He said there are very serious allegations that are present and that disciplinary action would take place. I interpreted that to mean what you said.

Q. Sir, didn't you state earlier today that President Hasselmo said he would remove you from office?

A. I don't recall. You'll have to look it up in the tape, but he said, in so many words, that disciplinary actions would take place, and he implied that that had to do with removal of my position.

Q. Did he ever mention the Fifth Amendment to you, or did you ever mention the Fifth Amendment to him?

[Objection on grounds of "asked and answered" overruled.]

A. I don't recall the words "Fifth Amendment" being used.

[T–2 at 104–05].

At another critical juncture, counsel for the Government questioned the Defendant as to whether, consistent with his counsel's written representation, the Defendant, on February 3, 1993, had "instructed [Opperman] that it [was] his very strong wish to continue all interviews with University personnel." Of course, a strong desire to testify, on the Defendant's part, would contradict his current view that the interview with the University officials was an act of coercion.

In responding to this line of inquiry, the Defendant, at first, conceded that he had told Opperman that it was his desire to be coop-

erative. [T–2 at 39]. Indeed, he acknowledged that, if Opperman's letter to Symchych included such a representation, then the statement was correct. [T–2 at 40]. Subsequently, however, the following colloquy transpired:

Q. So while Vance Opperman wrote to Jan Symchych on February 3, 1993, that it was your strong desire to continue interviews with University personnel, is it your testimony now that that was not correct?

A. You want a yes or no answer?

Q. That's the question; yes or no answer.

A. I would not characterize it as strong no.

Q. So you're qualifying your desire as not being strong, but you're still saying that the essence of it is correct; you had a desire to continue interviews?

A. That's correct.

Q. So is it your testimony, sir, that all of these complaints you made occurred after February 3rd?

A. The complaints that I made to the individuals I indicated, occurred at the time when they told me that I had to do this interview. In other words, in direct response.

Q. So it's your testimony that you were complaining to some about having to do the interview, but telling your attorney it was your desire to continue the interviews?

[Objection to question on argumentative, repetitious and vague and compound grounds overruled.]

A. I would not characterize it as desire. It was my statement to him that I had to do the interview. His interpretation may have been desire.

[T–2 at 64–66].

Like a grain through wood, the Defendant's reformative efforts have extended throughout his presentation to this Court. Notwithstanding his effort to favorably reconstruct the past, we find and conclude, in view of the entirety of the Record before us, that the Defendant's resort to *Garrity* was a last,

opportunistic refuge. Indeed, the testimony of Opperman, and of the Defendant, corroborates this view. Although Opperman had demanded a joint defense agreement as a precondition to any interview, when that demand was rebuffed, all that remained was some aspiration that *Garrity* might supply the protection that was otherwise denied by the University's refusal to embark on a joint defense with the Defendant.

At its core, the Defendant's employment of the *Garrity* doctrine is a thorough recasting of prior, contemporaneous events so as to parlay a consensual interview into a privileged communication. The contemporaneous expressions of Opperman, in late January and early February of 1993, are wholly inconsistent with any seriously held belief that the Defendant subjectively viewed his interview to be under penalty of a job loss. Instead, we are confronted with an individual who, following serious allegations of misconduct in the ALG program, openly and, by every appearance, freely submitted to intensive, public interrogation by members of the media, and by University officials. The same individual, willfully pledged his continuing cooperation with the University in late December of 1992, as well as in correspondence from his attorney just days before the interview. We are presented with no satisfactory explanation, for the Defendant's striking, final hour reversal, other than as an effort, by pinching and straining, to claim a *Garrity* entitlement that plainly does not fit.[29]

In drawing these findings, we are mindful of Anderson's use of a colloquialism which was sufficiently oblique as to allow some implication that the Defendant's failure to explain himself could result in his discipline.

Of course, Hasselmo and Symchych admitted as much—namely, that the University was not foregoing its authority to impose discipline for misconduct in the ALG program but, if the Defendant wanted to apprise the University of any factors which would bear upon the increasingly serious allegations of misconduct in that program, an opportunity was presented for him to do so. In Anderson's view, some of the official criticism of the ALG program was misplaced or ill-informed and could be readily blunted by the Defendant. Accordingly, Anderson concluded that the Defendant had no choice but to explain himself. More importantly, however, Anderson never advised the Defendant that the mere failure to give an interview, in and of itself, would serve as grounds for discipline. Further, Anderson has corroborated Hasselmo's testimony that Hasselmo had never voiced any such threat. As Hasselmo succinctly explained, he would not have disciplined the Defendant for refusing an interview, [T–1 at 239], and that view did not change even when pressed on the subject:

Q. * * * If [the] Defendant had spent ten hours claiming to every question, "I refuse to answer on the grounds that it may tend to incriminate me," don't you think that would give you grounds, as the president of a public institution, to take disciplinary action against him?

A. No, I don't believe so.

Q. You think he should stay as a department chair of the Department of Surgery if he takes the Fifth Amendment for ten hours, without any other facts cluttering this up?

A. I had evidence before me that was quite serious, and I was prepared to act

29. The Defendant encourages us to draw a "negative pregnant" from the silence that followed Opperman's preservation of a *Garrity* argument at the commencement of the February 9 interview. Since the *Garrity* privilege is self-executing when it is found to apply, no response from the University officials was either required or warranted. See, *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). We seriously doubt that, where one party makes a declaration that is belied by the totality of the surrounding events, another party bears any responsibility to counter-declare. As a simple matter of fact, Opperman did not invoke the Defendant's Fifth Amendment rights, nor did the

Defendant at any time during the course of the interview. Notwithstanding the Defendant's arguments to the contrary, we find the interview to have been unquestionably noncustodial and indisputably consensual. Indeed, we find striking parallels between the dilemma that faced the Defendant in consenting to testify at the Suppression Hearing, and that which he confronted at the February 9 interview. [T–2 at 4–20]. On both occasions, he was represented by legal counsel and, on both occasions, he elected to speak despite the attendant risks. We find that, on each occasion, the Defendant's election was voluntary.

on that evidence, but the fact that he would refuse to submit to an interview or that he would refuse to respond to questions during an interview would not have been reason for me to take separate action against him.

[T–1 at 261–62].

In sum, we conclude that the Defendant's resort to the *Garrity* doctrine is unavailing as he has failed to demonstrate that his will was overborne, that he was involuntarily obligated to waive his right to silence, or that his failure to consent to an interview would have resulted, in and of itself, in the imposition of discipline.[30] Therefore, we recommend that the Defendant's Motion to Suppress be denied.

NOW, THEREFORE, It is—

ORDERED:

That the Defendant's Motion to Amend [Docket No. 74] his Motion to Dismiss Counts 1 through 4 of the Superseding Indictment on vagueness and due process grounds is GRANTED.

AND, It is—

RECOMMENDED:

1. That the Defendant's Motion to Dismiss Counts 1 through 4 of the Superseding Indictment [Docket Nos. 41 and 74] be denied.

2. That the Defendant's Motion to Dismiss Counts 1 through 4 of the Superseding Indictment on Estoppel Grounds [Docket No. 45] be denied.

3. That the Defendant's Motion to Dismiss Count 1, Paragraph 10(b) of the Superseding Indictment [Docket No. 43] be denied.

4. That the Defendant's Motion to Dismiss Counts 14, 23, and 24 of the Superseding Indictment [Docket No. 131] be denied.

5. That the Defendant's Motion to Suppress Statement [Docket No. 65] be denied.

---

30. Applying the formulation of the *Friedrick* decision, the Defendant has failed to demonstrate that he subjectively believed that he was compelled to give a statement, and that his belief was

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D.Minn. LR1.1(f), and D.Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than January 6, 1996,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than January 6, 1996,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.

objectively reasonable. For reasons expressed at some length in the course of this Opinion, we so find.